Daley & Heft, LLP
Attorneys at Law
Mitchell D. Dean, Esq. (SBN 128926)
Lee H. Roistacher, Esq. (SBN 179619)
Heather E. Paradis, Esq. (SBN 276650)
Garrett A. Smee, Esq. (SBN 228055)
462 Stevens Avenue, Suite 201
Solana Beach, CA 92075
Telephone: (858) 755-5666
Facsimile: (858) 755-7870
E-mail: mdean@daleyheft.com
           lroistacher@daleyheft.com
           hparadis@daleyheft.com
           gsmee@daleyheft.com

Attorneys for Defendants
City of El Cajon and Richard Gonsalves

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD OLANGO ABUKA, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>CITY OF EL CAJON, RICHARD GONSALVES and DOES 1-10, Inclusive,<br><br>        Defendants.<br><br>AND ALL RELATED ACTIONS. | Case No.: 3:17-cv-00089-BAS-NLS<br>    consolidated with Case No:<br>    3:17-cv-00347-BAS-NLS)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS CITY OF EL CAJON AND RICHARD GONSALVES' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 5, 2018<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY COURT**<br><br>Courtroom: 4B<br>Judge:    Hon. Cynthia Bashant |

///

///

///

///

///

//////

1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................... 1

II. SUMMARY JUDGMENT STANDARDS ................................................. 5

III. UNDISPUTED FACTS ................................................................... 6

    A. Pre-Video Contact With Olango ............................................ 6

    B. Video Footage .................................................................. 9

IV. QUALIFIED IMMUNITY MANDATES SUMMARY JUDGMENT ON ROZIER'S AND ABUKA'S SECTION 1983 CLAIMS AGAINST GONSALVES ................................................................................ 12

    A. Fourth Amendment Claims Asserted On Olango's Behalf.... 16

        1. Use Of Force Claim ................................................... 16

            a. Step One: No Fourth Amendment Violation Because Gonsalves Reasonably Believed Olango Posed An Immediate And Serious Threat Of Death Or Harm........16

                i. Standard .................................................. 16

                ii. Analysis ................................................. 169

            b. Step Two: No Clearly Established Law Existed On September 17, 2016 Telling All Reasonable Officers That Deadly Force Under the Facts Of This Case Would Violate The Fourth Amendment..............................26

        2. Detention Based Claim ............................................... 29

            a. Step One: No Pre-Shooting Detention In Violation of The Fourth Amendment.....................................31

            b. Step Two: No Cleary Established Law Existed on September 27, 2016 Telling All Reasonable Officers That Any Pre-Shooting Detention Violated The Fourth Amendment.......................................31

    B. Abuka's Fourteenth Amendment Claims.............................. 31

        1. Step One: No Fourteenth Amendment Violation Because No Underlying Fourth Amendment Violation and No Conscience Shocking Conduct Amendment..................... ..31

            a. No Underlying Fourth Amendment Violation............... 32

i

|   |   | b. | Assuming An Underlying Fourth Amendment Violation, No Conscience Shocking Conduct Existed Because Gonsalves' Use of Force In Fact Paced Circumstances Served The Legitimate Law Enforcement Objection Of Self-Protection..............33 |

| | 2. | | Step Two: No Clearly Established Law Existed on September 27, 2016 Telling All Reasonable Officers That Deadly Force Under The Facts Of This Case Would Violate The 14th Amendment Violation ............................................. 36 |

V. SUMMARY JUDGMENT IS APPROPRIATE ON ROZIER'S FAILURE TO TRAIN BASED *MONELL* CLAIM ................................... 37

    A. No Underlying Fourth Amendment Violation ...................... 37

    B. Assuming A Fourth Amendment Violation, No Failure To Train Was The Moving Force Behind The Violation ........... 37

VI. CONCLUSION ............................................................. 39

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.D. v. California Highway Patrol*,
712 F.3d 446 (9th Cir. 2013)...............................................................34, 35

*Ames v. King Cty.*,
846 F.3d 340 (9th Cir. 2017)......................................................................28

*Arian v. City of Los Angeles*,
2013 WL 12081081 (C.D. Cal. Apr. 30, 2013).........................................22

*Atkinson v. Cty. of Tulare*,
790 F. Supp. 2d 1188 (E.D. Cal. 2011)......................................................34

*Barnes v. City of Pasadena*,
508 F. App'x 663 (9th Cir. 2013) ...............................................................22

*Bates v. Chesterfield Cty.*,
216 F.3d 367 (4th Cir. 2000).......................................................................25

*Billington v. Smith*,
292 F.3d 1177 (9th Cir. 2001)......................................................................34

*Blankenhorn v. City of Orange*
485 F.3d 463 (9th Cir. 2007);......................................................................38

*Bowles v. City of Porterville*,
2012 WL 1898911 (E.D. Cal. May 23, 2012)...............................22, 35, 36

*Boyd v. City & Cty. of San Fransisco*,
576 F.3d 938 (9th Cir. 2009)......................................................................12

*Breithaupt v. Abram*,
352 U.S. 432 (1957) ....................................................................................32

*Brendlin v. California*,
551 U.S. 249 (2007) ....................................................................................29

*Brosseau v. Haugen*,
543 U.S. 194 (2004) ....................................................................................17

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2010)................................................................17, 24

*Burns v. City of Concord*,
2017 WL 5751407 (N.D. Cal.) Nov. 28, 2017.........................................26

*California v. Hodari D.*,
499 U.S. 621 (1991) ....................................................................................30

iii

*Case v. Kitsap Cnty. Sheriff's Dep't,*
    249 F.3d 921 (9th Cir. 2011)...................................................................38

*Castro v. City of Los Angeles*
    2015 WL 4694070 ...................................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .................................................................................5

*Centeno v. City of Fresno,*
    2017 WL 3730400 (E.D. Cal. Aug. 30, 2017) ...........................................35

*City and City of San Francisco v. Sheehan,*
    135 S. Ct. 1765 (2015). .............................................................17, 24, 25

*City of Canton v. Harris,*
    489 U.S. 378 (1989) .............................................................................37, 38

*City of Los Angeles v. Heller,*
    475 U.S. 796 (1986) ...............................................................................37

*Collender v. City of Brea,*
    2013 WL 11316942 (C.D. Cal. Mar. 4, 2013) ...........................................36

*Connick v. Thompson,*
    563 U.S. 51 (2011) ...............................................................................37, 38

*Corrales v. Impastato,*
    650 F. App'x 540 (9th Cir. 2016) ............................................................22

*Cruz v. City of Anaheim,*
    765 F.3d 1076 (9th Cir. 2014)............................................................19, 21

*Cty. of Los Angeles v. Mendez*
    137 S.Ct. 1539 (2017), ........................................................................25, 26

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ............................................................................31, 32

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001)...................................................................24

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001)...................................................................5

*District of Columbia v. Wesby,*
    138 S.Ct. 577 (2018) ..................................................................... *Passim*

*Dougherty v. City of Covina*
    654 F.3d 892 (9th Cir. 2011)................................................................38

*Duclos v. Tillman,*
    2016 WL 8672917 (S.D. Cal. Mar. 11, 2016)............................................5

iv

*Easley v. City of Riverside,*
    890 F.3d 851 (9th Cir. 2018)............................................................*Passim*

*Elliot v. Leavitt,*
    99 F.3d 640 (4th Cir. 1996).........................................................18

*Elvira v. City of Escondido,*
    2016 WL 5719825 (S.D. Cal. Sept. 30, 2016) ..................................*Passim*

*Estate of Elkins v. California Highway Patrol,*
    2016 WL 3648944 (E.D. Cal. July 7, 2016) ...............................19

*Estate of Larsen v. Murr,*
    511 F.3d 1255 (10th Cir. 2008)..................................................18

*Estate of Serrano v. Trieu,*
    713 F. App'x 631 (9th Cir. 2018) ..............................................26

*Estate of Wasilchen v. Gohrman,*
    870 F. Supp. 2d 1115 (W.D. Wash. 2012) .................................33

*Fairbank v. Wunderman Cato Johnson,*
    212 F.3d 528 (9th Cir. 2000).......................................................5

*Felarca v. Birgeneau,*
    891 F.3d. 809 (9th Cir. 2018).....................................................*Passim*

*Fewell v. California,*
    2017 WL 6043080 (C.D. Cal. Apr. 11, 2017)...........................34

*Florida v. Bostick,*
    501 U.S. 429 (1991) ...................................................................30

*Garcia v. United States,*
    2018 WL 1448744 (C.D. Cal. Mar. 23, 2018) ..........................19

*Gausvik v. Perez,*
    392 F.3d 1006 (9th Cir. 2004)..............................................32, 33

*George v. Morris,*
    736 F.3d 829 (9th Cir. 2013)......................................................*Passim*

*Gonzalez v. City of Anaheim,*
    747 F.3d 789 (9th Cir. 2014)..............................................1, 32, 35

*Graham v. Connor,*
    490 U.S. 386 (1989) ...................................................................*Passim*

*Gregory v. County of Maui,*
    523 F.3d 1103 (9th Cir. 2008)......................................................5

*Hamby v. Hammond,*
    821 F.3d 1085 (9th Cir. 2016).....................................................14

v

*Hammett v. Paulding Cty.*,
　875 F.3d 1036 (11th Cir. 2017) ................................................................. 23

*Hayek v. City of St. Paul*,
　488 F.3d 1049 (8th Cir. 2007) ................................................................... 25

*Hayes v. Cty. of San Diego*,
　736 F.3d 1223 (9th Cir. 2013) ........................................................... *Passim*

*Hill v. Witt*,
　2010 WL 2902246 (N.D. Okla. July 22, 2010) ........................................ 24

*Horstman v. City of Hillsboro*,
　2018 WL 1736046 (9th Cir. Apr. 11, 2018) ............................................. 27

*Hudspeth v. City of Shreveport*,
　2006 WL 3747446 (W.D. La. Dec. 18, 2006) ........................................... 24

*Hunter v. Bryant*,
　502 U.S. 224 (1991) .................................................................................. 17

*Hunter v. Cty. of Sacramento*,
　652 F.3d 1225 (9th Cir. 2011) ................................................................. 38

*Illinois v. Wardlow*,
　528 U.S. 119 (2000) ................................................................................. 31

*Isayeva v. Sacramento Sheriff's Dep't*,
　872 F.3d 938 (9th Cir. 2017) ............................................................. 25, 26

*Kaur v. City of Lodi*,
　263 F.Supp. 947 (E.D. Cal. 2017) ........................................................... 31

*Keates v. Koile*,
　883 F.3d 1228 (9th Cir. 2018) ................................................................. 15

*Kirkpatrick v. Cty. of Washoe*,
　843 F.3d 784 (9th Cir. 2016) ................................................................... 15

*Kisela v. Hughes*,
　138 S.Ct. 1148 (2018) .................................................................. 13, 27, 28

*Knox v. City of Fresno*,
　708 F. App'x 321 (9th Cir. 2017) ............................................................ 26

*Kramer v. Cullinan*,
　878 F.3d 1156 (9th Cir. 2018) ................................................................. 15

*Kuhlken v. Cty. of San Diego*,
　2018 WL 454444 (S.D. Cal. Jan. 16, 2018) ............................................ 15

*Lal v. California*,
　746 F.3d 1112 (9th Cir. 2014) ................................................................. 18

*Lamont v. New Jersey*,
    637 F.3d 177 (3rd Cir. 2011)........................................................................23

*Little v. Smith*,
    114 F. Supp. 2d 437 (W.D.N.C. 2000) ......................................................24

*Longoria v. Pinal County*,
    873 F.3d 699 (9th Cir. 2017)..........................................................19, 20, 21

*Mattos v. Agarano*,
    661 F.3d 433 (9th Cir. 2011)............................................................. *Passim*

*Menjivar v. City of Los Angeles*,
    2007 WL 4662062 (C.D. Cal. July 24, 2007) ...........................................35

*Messerschmidt v. Millender*,
    132 S.Ct. 1235 (2012) ................................................................................12

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978) ...................................................................... *Passim*

*Moonin v. Tice*,
    868 F.3d 853 (9th Cir. 2017)......................................................................14

*Morales v. Fry*,
    873 F.3d 817 (9th Cir. 2017)......................................................................14

*Moreland v. Las Vegas Metro. Police Dep't*,
    159 F.3d 365 (9th Cir. 1998).........................................................31, 32, 34

*Mullenix v. Luna*,
    136 S.Ct. 305 (2015) ..................................................................................14

*Nehad v. Zimmerman*,
    2017 WL 6453475 (S.D. Cal. Dec. 18, 2017).....................................22, 29

*Parker v. City of Pomona*,
    67 F. App'x 1001 (9th Cir. June 3, 2003) .................................................35

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ...................................................................................13

*Plumhoff v. Richard*,
    134 S.Ct. 2012 (2014) .................................................................16, 17, 18

*Pollard v. City of Columbus*,
    780 F.3d 395 (6th Cir. 2015)................................................................19, 23

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008).......................................................32, 33, 34

*Rodriguez v. Swartz*,
    899 F.3d 719 (9th Cir. Aug. 7, 2018).........................................................21

vii

*Ryburn v. Huff*,
132 S.Ct. 987 (2012) ..........................................................................16, 17

*S. B. v. Cty. of San Diego*,
864 F.3d 1010 (9th Cir. 2017)...................................................................15

*Saucier v. Katz*,
533 U.S. 194 (2001) .............................................................16, 18, 25

*Schaefer v. Goch*,
153 F.3d 793 (7th Cir. 1998)...................................................................33

*Schwarz v. Lassen Cty.*,
2013 WL 5425102, at *20-21 (E.D. Cal. Sept. 27, 2013)........................33

*Scott v. Harris*,
550 U.S. 372 (2007) .............................................................15, 16, 19

*Scott v. Henrich*,
39 F.3d 912 (9th Cir. 1994).....................................................................18

*Shafer v. Cty. of Santa Barbara*,
868 F.3d 1110 (9th Cir. 2017)......................................................26, 27, 28

*Sharp v. Cty. of Orange*,
871 F.3d 901 (9th Cir. 2017)...................................................................27

*Sherrod v. Berry*,
856 F.2d 802 (7th Cir. 1988)...................................................................21

*Simmonds v. Genesee Cty.*,
682 F.3d 438 (6th Cir. 2012)...................................................................23

*Slattery v. Rizzo*,
939 F.2d 213 (4th Cir. 1991)...................................................................23

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005)...................................................................30

*Smith v. Freland*,
954 F.2d 343 (6th Cir. 1992).....................................................................1

*Tatum v. City & Cty. of San Francisco*,
441 F.3d 1090 (9th Cir. 2006)..................................................................33

*Terry v. Ohio*,
392 U.S. 1 (1968) ...................................................................................29

*Thompson v. Rahr*,
885 F.3d 582 (9th Cir. 2018)...................................................................14

*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975) ...............................................................................29

*United States v. Charley*,
  396 F.3d 1074 (9th Cir. 2005)......................................................................29

*United States v. Edwards*,
  761 F.3d 977 (9th Cir. 2014).......................................................................30

*United States v. Flatter*,
  456 F.3d 1154 (9th Cir. 2006).....................................................................30

*United States v. Martinez-Jimenez*,
  864 F.2d 664 (9th Cir. 1989).......................................................................21

*United States v. McClendon*,
  713 F.3d 1211 (9th Cir. 2013).....................................................................30

*United States v. Smith*,
  633 F.3d 889 (9th Cir. 2011).......................................................................39

*White v. Pauly*,
  137 S. Ct. 548 (2017) .......................................................................*Passim*

*Wilkinson v. Torres*,
  610 F.3d 546 (9th Cir. 2010)........................................................18, 32, 32

*Zion v. Cty. of Orange*,
  874 F.3d 1072 (9th Cir. 2017).....................................................................32

**Statutes**

42 U.S.C. § 1983.....................................................................................*Passim*

California Penal Code § 148(a)(1).......................................................................30

Fed. R. Civ. P. 56…………………………………………………………………5

**Constitution**

Fourth Amendment…………………………………………………*Passim*

Fourteenth Amendment…………………………………………….*Passim*

# I.[1]

# INTRODUCTION

The public often forgets or ignores that police officers, every day, face a "dangerous and complex world." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). "Every day of the year, law enforcement officers leave their homes to police, protect, and serve their communities. Unlike most employees in the workforce, peace officers carry firearms because their occupation requires them on occasion to confront people who have no respect either for the officers or for the law." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 799 (9th Cir. 2014) (Trott, J., dissenting in part and concurring in part). "By asking police to serve and protect us, we citizens agree to comply with their instructions and cooperate with their investigations. Unfortunately, not all of us hold up our end of the bargain. As a result, officers face an ever-present risk that routine police work will suddenly become dangerous." *Mattos v. Agarano,* 661 F.3d 433, 453 (9th Cir. 2011) (en banc) (Kozinski, C.J., concurring in part and dissenting in part). Indeed, "[p]olice officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This case epitomizes these often ignored or forgotten truths.

On September 27, 2016, Alfred Olango - acting erratically and ignoring repeated orders to simply remove his right hand from his front right pant pocket - was shot and killed by El Cajon Police Officer Richard Gonsalves after Olango placed Gonsalves in imminent fear for his life by suddenly producing an object from his pocket resembling a gun, and with both hands together in a classic "shooting stance" pointed it directly at Gonsalves:

---

[1] The Court extended the page limit for this motion to 40 pages. No. 17-cv-00089, Doc. No. 47.



The object Olango removed from his pocket and pointed directly at Gonsalves was a gun shaped "vape" with a metal barrel:



///

///

///

There is no dispute about what happened. The incident is on video. And it shows Olango very quickly removing his right hand from his right pocket, joining it together with his left hand while simultaneously extending his arms outward, getting into a "shooting stance", and pointing an object with a barrel at Gonsalves.[2] Exh. C, Video 1.1 (00:00-00:15); Video 1.2 (00:35-00:38); Video 1.3 (00:35-00:380); Video 2.1 (14:09:52-14:09:54). When slowed down and enlarged, the video actually shows Olango mimicking the recoil of a gun. Exh. C, Video 1.2 (00:35-00:38); Video 1.3 (00:35-00:38). It also shows Gonsalves ducking, a reflexive action confirming Gonsalves believed he was going to be shot. *Id.* Although Olango's death is unfortunate, Gonsalves' use of deadly force was constitutional.

This consolidated action involves a lawsuit brought by Olango's wife and children (collectively "Rozier") and one brought by Olango's father, Richard Abuka. No. 17-cv-00347, Doc. Nos. 5, 24; No. 17-cv-00089, Doc. No. 6. Rozier alleges a 42 U.S.C. section 1983 claim on Olango's behalf against Gonsalves for seizures in violation of the Fourth Amendment. No. 17-cv-00347, Doc. No. 5, pp. 9-13. Against the City, Rozier alleges on Olango's behalf a section 1983 municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), based on inadequate training. No. 17-cv-00347, Doc. No. 5, pp. 13-19.[3]

Abuka asserts in his own capacity two section 1983 causes of action against Gonsalves for violating his Fourteenth Amendment right to familial

[2] Exhibit C is a DVD containing four videos and still frames. In the "Los Panchos Surveillance" folder is a single video containing raw video footage from a surveillance camera. In the "Cell Phone Video" folder are three videos. "Video 1.1" is a cell phone video taken by a witness, with some enhancements to the video. "Video 1.2" and "Video 1.3" are portions of Video 1.1 that have been scaled and slowed down. See Sutherland Decl.; Gonsalves Decl.

[3] This Court dismissed Rozier's state law wrongful death causes of action on May 18, 2018 and September 5, 2018. No. 17-cv-00089, Doc. Nos. 50, 52.

3

association with Olango, which Abuka alleges was caused by the "unjustified" and "excessive force" Gonsalves used against Olango, as well as Gonsalves' failure to provide medical care to Olango after Olango was shot.[4] No. 17-cv-00089, Doc. No. 6, pp. 8-11.

As to Rozier's section 1983 claims, Gonsalves is entitled to qualified immunity because he reasonably believed – a belief confirmed by video evidence and witness testimony – that he needed to eliminate an imminent and very serious threat posed by Olango. Thus, Gonsalves' use of deadly force was objectively reasonable and, accordingly, no Fourth Amendment violation exists. Moreover, no clearly established law existed in September 2016 putting all reasonable officers on notice that using deadly force under the specific facts of this case would violate the Fourth Amendment. And since no Fourth Amendment violation exists, the City cannot be liable under *Monell* and Rozier cannot otherwise establish a failure to train claim.

As to Abuka's section 1983 claims, Gonsalves is entitled to qualified immunity because there was no violation of Olango's Fourth Amendment rights and, notwithstanding, Gonsalves did not engage in "conscience shocking" conduct because he did not shoot Olango with a purpose to harm unrelated to a legitimate law enforcement objective. Gonsalves' use of deadly force was solely for self protection, which is a legitimate law enforcement objective. Further, no clearly established law existed in September 2016 putting all reasonable officers on notice that using deadly force under the specific facts of this case would violate a family member's Fourteenth Amendment rights.

///

///

///

---

[4] Abuka had alleged a *Monell* claim, but he never amended his complaint after this Court granted the City's motion to dismiss. No. 17-cv-00089, Doc. No. 34.

4

## II.

## SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment upon demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.' [Citation]." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *see Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("[A] moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'-that is, pointing out through argument-the absence of evidence to support plaintiff's claim.") In ruling on a defendant's summary judgment motion, the court views the facts in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). But in cases dealing with an officer's use of force, the court cannot adopt plaintiff's version of facts if blatantly contradicted by a video (or other evidence). *Id.* at 380; *Gregory v. County of Maui*, 523 F.3d 1103, 1108 (9th Cir. 2008). Rather, the court must "view[] the facts in the light depicted by the videotape." *Scott,* 550 U.S. at 380-381; *Duclos v. Tillman*, 2016 WL 8672917, at *2 (S.D. Cal. Mar. 11, 2016) (Bashant, J.).

///

///

///

///

///

///

///

5

## III.

## UNDISPUTED FACTS[5]

### A.    Pre-Video Contact With Olango

Around 2:03 p.m. on September 27, 2016, Gonsalves and fellow officer Josh McDaniel got a dispatch call about a potentially mentally ill man acting strangely and walking into traffic (i.e., Olango). Gonsalves Decl., ¶ 3; McDaniel Decl., ¶ 4; Gonsalves Depo., pp. 43:22-44:11, attached as Exh. I; *see* Lanier Depo., pp. 12:16-14:25, 16:13-23, 50:6-52:2 (describing Olango running back and forth across street), attached as Exh. F; Carroll Depo., pp. 10:18-18:19, 20:3-23, 32:23-33:21 (describing Olango in traffic and her fear of him), attached as Exh. G; Olango Depo., pp. 107:16 -117:7 (describing Olango repeatedly crossing the street and almost getting hit by cars), attached as Exh. H.

Around 2:08 p.m., Gonsalves arrived at Broadway and Mollison planning to locate and talk to Olango.  Gonsalves Decl., ¶ 3.  Gonsalves was in full uniform and driving a marked police car.  *Id.*  Gonsalves met McDaniel at a gas station at the corner of Broadway and Mollison.  *Id.*; McDaniel Decl., ¶¶ 4, 5.  Neither had seen Olango.  *Id.*  Olango's sister, Lucy, soon approached the officers from across the street and McDaniel got out of his car to talk to her. Gonsalves Decl., ¶ 5; McDaniel Decl., ¶ 5.  Gonsalves remained in his car. Gonsalves Decl., ¶ 5.  Lucy said she last saw Olango on Broadway, west of Mollison.  Gonsalves Decl., ¶ 6; McDaniel Decl., ¶ 5.  Gonsalves left to find Olango.  Gonsalves Decl., ¶ 6.  McDaniel asked Lucy some questions about Olango, then got back in his car and left to find Olango.  McDaniel Decl., ¶ 5.

---

[5] With the exception of Olango's cocaine intoxication, the facts are taken from Gonsalves' declaration and deposition, the declaration and deposition of Officer Josh McDaniel, videos of the incident, the deposition testimony of independent witnesses Lakenya Lanier, Melvin Roberts, Christine Carroll and Leone Ket, and the deposition of Olango's sister, Lucy Olango, taken in her state court action against Gonsalves and the City.

Around 2:10 p.m., Gonsalves first observed Olango walking toward Broadway in a strip mall parking lot near a taco shop. Gonsalves Decl., ¶ 7. Gonsalves drove to the area, made eye contact with Olango, and then got out of his patrol car saying something to Olango like "Hey, I need to talk to you"" *Id.* Olango stopped about 15-20 feet from Gonsalves. *Id.* Gonsalves noticed a bulge in Olango's right front pocket and saw Olango put his right hand in the pocket. *Id.* at ¶ 8; *see* Lanier Depo., p. 23:4-8 (Olango's right hand in his pocket when Gonsalves exited his car). Using a calm, clear and non-stern voice, Gonsalves told Olango to remove his hand from his pocket. Gonsalves Decl., ¶ 9; Lanier Depo., p. 25:14-24 (clear and calm commands by Gonsalves). Olango said nothing and did not remove his hand. Gonsalves Decl. ¶ 9. Gonsalves' repeated requests to Olango to remove his hand were more stern and louder. *Id.* Olango refused to remove his hand, and repeatedly said "no." *Id.*; Lanier Depo., pp. 12:16-15:4, 16:13-23, 33:8-36:11. In case Olango was deaf or did not understand English, Gonsalves several times imitated the motion of taking a hand out of his own pocket as a visual cue to Olango. Gonsalves Decl. ¶ 9; Gonsalves Depo., pp. 50:23-51:10, 53:6-9, 58:24-59:9. Keeping his hand in his pocket, Olango backed away from Gonsalves. *Id.* Around 2:10:41, Gonsalves broadcast locating Olango and advised Olango would not remove his hand from his pocket. Gonsalves Decl., ¶ 8; Gonsalves Depo., pp. 46:4-11, 53:25-54:9; Exh. A to Gonsalves Decl. (audio file "Recorded on 27-Sept-2016 at 14:10.19"); Exh. B to Gonsalves and Cabana Decls., p. 2.

Based on Olango's behavior, Gonsalves believed Olango was going to run or fight. Gonsalves Decl., ¶ 10. Gonsalves also thought Olango might be under the influence of narcotics. Gonsalves Depo., p. 98:20-25; *see* Lanier Depo., pp. 25:4-13, 27:20-29:25 (having bought and done drugs with Olango, she thought he was "on drugs"). Because Gonsalves believed the bulge in Olango's pocket was larger than a hand, coupled with the way Olango was moving and his refusal

7

to take his hand out of his pocket, Gonsalves thought Olango might have a gun in his pocket. Gonsalves Decl. ¶ 11; Gonsalves Depo., pp. 51:11-52:14, 74:2-20; *see* Lanier Depo., pp. 26:20-25, 47:20-48:6 (describing Olango's hand in his pocket as "bulky" which lead her to believe Olango had a weapon in his pocket). Gonsalves put his left hand on his holstered gun.[6] Gonsalves Decl. ¶ 11. Olango moved away from Gonsalves in a purposeful manner, walking rapidly backward and sideways with his hand remaining in his pocket despite Gonsalves' repeated requests to remove it. *Id.*; Lanier Depo., pp. 12:16-15:4, 16:13-23, 33:8-36:11.

Since Olango reportedly had been walking into traffic and was acting erratically, Gonsalves was concerned for Olango's safety and the safety of anyone in the area. Gonsalves Decl., ¶ 11; Gonsalves Depo., pp. 81:17-82:2. Gonsalves did not want Olango running away and into traffic where Olango or anyone else could get hurt. Gonsalves Decl., ¶ 11; *see* Lanier Depo., pp. 12:16-14:25, 16:13-23, 50:6-52:2; Carroll Depo., pp. 10:18-18:19, 20:3-23, 32:23-33:21. Nor did Gonsalves want Olango entering any of the businesses at the strip mall, particularly since he had not yet talked to Olango, Olango still had his hand in his pocket, and Gonsalves had yet to confirm that Olango was not armed. Gonsalves Decl. ¶ 11. For the same reasons, Gonsalves was concerned for his safety and the safety of others in the area. *Id.*; Gonsalves Depo., pp. 81:17-82:2.

Walking back and forth, while generally backing up, Olango walked himself into an area of containment, toward a fence and parked cars. Gonsalves Decl., ¶ 12; Lanier Depo., p. 52:3-20. Because Gonsalves could better control the situation until McDaniel or other officers arrived if Olango was somewhat contained, Gonsalves matched Olango's movements while repeatedly commanding Olango to remove his hand from his pocket. Gonsalves Decl. ¶ 12; Gonsalves Depo., pp. 71:9-73:15, 82:4-83:2, 97:4-24; *see* Lanier Depo., pp. 12:16-15:15, 16:13-23,

---

[6] Gonsalves was not carrying a Tazer. Gonsalves Decl., ¶ 3.

33:8-36:11. While facing Gonsalves, Olango kept his hand in his pocket as he erratically moved backward and sideways. Gonsalves Decl. ¶ 12. Fearing for his safety, Gonsalves removed his gun but kept it along his left upper thigh. *Id.*; Gonsalves Depo., pp. 53:4-17, 72:7-25, 76:2-6; Exh. C, Video 2.1 (14:09:24)

During the encounter, Gonsalves made at least two radio calls advising that Olango would not remove his hand from his pocket. Exh. A; Exh. B, p. 2. One time, Gonsalves allowed his command to Olango to be broadcast and heard by other officers. Gonsalves Decl., ¶ 12; McDaniel Decl., ¶ 6; Exh. A (audio file "Recorded on 27-Sept-2016 at 14:10:40"). Gonsalves knew that if other officers heard him telling Olango to remove his hand it would be known that Olango was being non-compliant. Gonsalves Decl., ¶ 12. Gonsalves did this because he did not want to potentially make the situation worse if Olango saw or heard him make a standard radio broadcast. *Id.*

## B. Video Footage

The rest of the encounter is captured on video. Gonsalves Decl., ¶ 14; Exh. C to Gonsalves and Sutherland Decls., Videos 1.1, 1.2, 1.3, 2.1. Because Olango's erratic behavior continued, his movements became more furtive, and his hand remained in his pocket, Gonsalves moved his gun to a "compressed ready" position with the gun pointed downward flat against his chest and repeatedly commanded Olango to remove his hand from his pocket. Gonsalves Decl., ¶ 15; Gonsalves Depo., pp. 76:7-9; Exh C, Video 2.1 (14:09:30); Lanier Depo., pp. 12:16-15:19, 16:13-23, 24:18-25, 46:24-47:24; Roberts Depo., pp. 19:3-15, 49:14-23, attached as Exh. J (describing Olango as agitated). As the video shows, McDaniel arrived just prior to the shooting and took a position to the side of Olango. Exh. C, Video 2.1 (14:09:38). Because Gonsalves had his gun drawn, McDaniel removed his Taser to provide an alternative less lethal force option. McDaniel Decl., ¶ 7. McDaniel began moving closer to Olango so he would be close enough to use the Taser if necessary. McDaniel Decl., ¶ 7;

9

Exh. C, Video 2.1 (14:09:52). Lucy Olango had suddenly appeared at the scene and was screaming behind Gonsalves, presumably at Olango. Gonsalves Decl., ¶ 15; Exh. C, Video 2.1 (14:09:52). Gonsalves, Lucy and a witness were all telling Olango to take his hand out of his pocket. Lanier Depo., pp. 12:16-15:23, 16:13-23, 24:18-25, 46:24-47:24; Olango Depo., pp. 133:8-135:5. Gonsalves was concerned with how close Lucy was to him, so he turned toward her and said "stay back" while pointing at her with his right arm/hand across his chest. Gonsalves Decl., ¶ 15; Gonsalves Depo., pp. 65:6-22, 86:3-87:18, 104:14-19; Exh. C, Video 1.2 (00:21-00:27), Video 1.3 (00:21-00:27). Olango was still ignoring repeated commands to take his hand out of his pocket. McDaniel Depo., pp. 70:23-71:14, 76:10-77:10, 86:14-18, 104:8-105:10, attached as Exh. K; Ket Depo., pp. 20:1-13, 26:6-11, 62:1-13, attached as Exh. L.

As the video shows, and as Gonsalves, McDaniel and the witnesses confirm, immediately after Gonsalves turned from addressing Lucy, Olango finally, and very quickly, took his right hand out of his right pocket, joined it together with his left hand, simultaneously put his body into a classic "shooter's stance" and pointed an object with a metal barrel that he had removed from his pocket directly at Gonsalves.[7] Exh. C, Video 1.1 (00:00-00:15); Video 1.2 (00:32-00:39); Video 1.3 (00:32-00:39); Video 2.1 (14:09:49-14:09:56); Gonsalves Decl., ¶¶ 16-17; McDaniel Decl., ¶ 9; Gonsalves Depo., pp. 13:17-23, 26:21-29:4, 38:6-12, 79:25-80:1, 89:24-93:4; McDaniel Depo., pp. 77:2-21, 84:24-85:3; Olango Depo., 135:2-138:3 and Depo. Exhs. 4, 5; Roberts Depo., pp. 23:2-28:17, 36:21-37:10, 41:16-23, 60:2-61:15; Lanier Depo., pp. 18:12-21:17, 23:15-24:5, 25:25-27:10; 36:12-39:14, 47:9-49:20, 61:25-62:7; Ket Depo., pp. 17:20-22:11, 58:9-60:11, 61:15-25, 67:14-69:1, 69:15-72:23. When this

_____

[7] One witness heard Olango yell "shoot me" and believed Olango was attempting "suicide by cop." Roberts Depo., pp, 19:3-22, 40:17-41:23. McDaniel heard Olango say something like "fuck this", "fuck that", or "fuck it." McDaniel Depo., p. 77:2-12.

occurred, Gonsalves and Olango were less than 20 feet apart. Gonsalves Depo., pp. 84:20-85:24.

Seeing Olango in a "shooter stance," and seeing a metal barrel in Olango's hands pointed at him, Gonsalves thought Olango had a gun (as did McDaniel and all the witnesses) and believed Olango was going to shoot him. Gonsalves Decl., ¶ 17; Gonsalves Depo., pp. 13:17-23, 26:21-29:4, 38:6-12, 79:25-80:1, 89:24-93:4; McDaniel Decl., ¶ 9; McDaniel Depo., pp. 77:2-21, 84:24-85:3; Robert Depos., pp. 23:2-28:17, 36:21-37:10, 41:16-23, 60:2-61:15; Lanier Depo., pp. 18:17-21:17, 23:15-24:5, 25:25-27:10; 36:12-39:14, 47:9-29:20, 61:25-62:7; Ket Depo., pp. 17:20-22:11, 58:9-60:11, 61:15-25, 67:14-69:1, 69:15-72:23. In fact, Olango mimicked the firing of a gun (i.e., recoil action) with his arms. Exh. C, Video 1.2 (00:35-00:38); Video 1.3 (00:35-00:38). And Gonsalves actually first ducks out of the way, and only then did Gonsalves shoot Olango. *Id.* At the same time McDaniel thought Olango was going to shoot Gonsalves and deployed his Taser, shocked at how fast Olango "drew" and "got the drop" on Gonsalves. McDaniel Decl., ¶ 9. As shots were fired, McDaniel initially thought Olango may have shot Gonsalves. *Id.* McDaniel fired the Taser at Olango hoping it would stop Olango from shooting again. *Id.* Fearing for his life, Gonsalves shot Olango four times in rapid succession and he stopped firing when he believed the threat Olango posed had been eliminated. Gonsalves Decl., ¶ 17; Gonsalves Depo., pp. 13:17-25, 26:21-29:14, 38:6-12, 79:25-80:1, 89:12-93:4. At no time prior to the shooting did Olango ever remove his right hand from his pocket. Exh. C, Videos 1.1, 1.2, 1.3, 2.1; Lanier Depo., pp. 23:4-24:5; Ket Depo., 17:20-22:11. After the shooting, Gonsalves learned Olango had a "vape" in his hand and not a gun. Gonsalves Depo., pp. 38:6-39:1.

Gonsalves immediately reported shots fired at 2:11:52. Gonsalves Decl., ¶ 17; Exh. A (audio filed "Recorded on 27-Sept-2016 at 14:11.52); Exh. B, p. 2. Having first contacted Olango at around 2:10:41, the time from Gonsalves' initial

11

contact with Olango to the shooting was about 70 seconds. *Id.* Immediately

after shooting Olango, Gonsalves also requested medical care for Olango and

paramedics arrived minutes later to treat Olango and transport him to the

hospital. Gonsalves Decl., ¶¶ 17, 19; McDaniel Decl., ¶ 10; Exh. C, Video 1.2

(01:07-01:41); Video 2.1 (14:15:30-14:21:40).

Prior to this incident, Gonsalves never met, knew of, or saw Olango.

Gonsalves Decl., ¶ 20. Before shooting Olango, Gonsalves was not upset or mad

at Olango and harbored no ill will toward him. *Id.*

A post-mortem toxicology test on Olango revealed levels of cocaine

metabolites consistent with Olango having recently consumed a toxic amount of

cocaine, and his behavior throughout the incident was consistent with cocaine

overdose. Toxicology Report, p.2, attached as Exh. Q to Notice of Lod.; Gellar

Report, pp. 32-38 attached as Exh. R to Notice of Lod.[8]

## IV.

### QUALIFIED IMMUNITY MANDATES SUMMARY JUDGMENT ON ROZIER'S AND ABUKA'S SECTION 1983 CLAIMS AGAINST GONSALVES

"[Q]ualified immunity is important to society as a whole and because as an

immunity from suit, qualified immunity is effectively lost if a case is erroneously

permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)

(quotation marks and citations omitted). "Qualified immunity gives government

officials breathing room to make reasonable but mistaken judgments, and protects

all but the plainly incompetent or those who knowingly violate the law."

*Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012) (quotation marks and

citations omitted). Qualified immunity protects law enforcement officers from

---

[8] Evidence of Olango's cocaine intoxication is relevant to explain his erratic behavior and if there is a dispute about Olango's conduct. *Boyd v. City & Cty. of San Fransisco*, 576 F.3d 938, 944 (9th Cir. 2009); *see Castro v. Cty. of Los Angeles*, 2015 WL 4694070, at *5-6 (discussing admissibility of intoxication evidence).

12

liability for "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Courts engage in a two-pronged analysis to determine whether qualified immunity applies: '[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018). "A plaintiff must prove both steps of the inquiry to establish the officials are not entitled to immunity from the action." *Felarca v. Birgeneau*, 891 F.3d. 809, 815 (9th Cir. 2018).

In qualified immunity's two-step analysis "the Court considers only the facts that were knowable to the defendant." *White*, 137 S. Ct. at 550. The court first determines whether a violation of a constitutional right occurred. *Mattos v. Agarano*, 661 F.3d 443, 440 (9th Cir. 2011) (en banc). If not, qualified immunity shields the officer from suit. If a constitutional violation did occur, the court next determines whether the "constitutional right was clearly established in light of the specific context of the case' at the time of the events in question" such that "its contours were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' [Citation]." *Id.* at 440, 442.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. While [the Supreme] Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (quotation marks and citations omitted); *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam); *Wesby*, 138 S.Ct. at 589-590. "[T]he fact-specific, highly contextualized nature

13

of the [clearly established] inquiry does not depend on which particular constitutional right a given plaintiff claims the officials have violated." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

The Supreme Court has repeatedly said that "[c]learly established" law may not be generally defined using broad constitutional principles regarding the use of force. *Kisela*, 584 U.S. at 1153; *Wesby*, 138 S.Ct. at 590; *White*, 137 S.Ct. at 551-552; *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam); *see Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017) ("Broad principles ordinarily cannot constitute clearly established law. Rather, clearly established law must be particularized to the facts of the case.") (quotation marks and citation omitted). Thus, to be clearly established, "existing precedent [must have] placed the statutory or constitutional question beyond debate" under the "particularized' . . . facts of the case" and in light of the "particular conduct" of the officer. *White*, 137 S.Ct. at 552; *Wesby*, 583 U.S. at 590. Because "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law", *White*, 137 S.Ct. at 551, "[a] clearly established right is one that is 'sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (emphasis added); *see Felarca,* 891 F.3d at 816 ("The Supreme Court has repeatedly told courts ' not to define clearly established law at a high level of generality.' [Citation]. The law must have been clear enough that '*every* reasonable official' would know he or she was violating the plaintiff's rights. [Citations.]."); *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018); *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). As the Supreme Court recently explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' [citation], which means it is dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority,' [citation]. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that

14

*every reasonable official* would interpret it to establish the particular rule the plaintiff seeks to apply. [Citation]. Otherwise, the rule is not one that 'every reasonable official' would know. [Citation].

*Wesby*, 138 S.Ct. at 589-590 (emphasis added). Accordingly, "[s]o long as existing case law 'did not preclude' an official from reasonably believing that his or her conduct was lawful, the official has a right to qualified immunity. [Citation]." *Kramer v. Cullinan*, 878 F.3d 1156, 1163 (9th Cir. 2018).

Simply put, qualified immunity is an exacting and "demanding standard." *Wesby*, 138 S.Ct. at 589; *S. B. v. Cty. of San Diego*, 864 F.3d 1010, 1015, 1017 (9th Cir. 2017) (hearing the Supreme Court "loud and clear" and recognizing qualified immunity's "exacting standards"); *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 792 (9th Cir. 2016) (en banc) (recognizing qualified immunity's "exacting standards"); *see also Keates v. Koile*, 883 F.3d 1228, 1234-1235 (9th Cir. 2018) ("[D]efendants are entitled to qualified immunity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The Supreme Court has emphasized that *this is a low bar* ….."); *Kuhlken v. Cty. of San Diego*, 2018 WL 454444, at *11 (S.D. Cal. Jan. 16, 2018) (Bashant, J.) (noting *White's* "exacting standard" requires "clear notice" to the officer and observing that "[w]hile 'no two cases are exactly alike' and the Court is not required to find a case 'directly on point,' Plaintiff has not provided any precedent particularized to the facts of this case that would have put Deputy Smith on notice that his conduct was unconstitutional").

///

///

///

///

///

15

**A.    Rozier's Fourth Amendment Claims Asserted On Olango's Behalf**

**1.    Use Of Force Claim**

**a.    Step One: No Fourth Amendment Violation Because Gonsalves Reasonably Believed Olango Posed An Immediate And Serious Threat Of Death Or Harm**

    **i.    Standard**

The Fourth Amendment permits "objectively reasonable" force. *Graham v Connor,* 490 U.S. 386, 396-397 (1989).  On summary judgment, whether an officer's use of force was objectively reasonable presents "a pure question of law." *Scott*, 550 U.S. at 381 n.8; *Plumhoff v. Richard,* 134 S.Ct. 2012, 2019 (2014).  Included in this "pure question of law" is whether a suspect's actions rose to a level warranting deadly force." *Scott*, 550 U.S. at 384; *see Mattos*, 661 F.3d at 445 (a defiant suspect "bears some responsibility for the escalation" of an incident ultimately resulting in the use of deadly force).

"[R]easonableness" is an objective inquiry, examined in light of the facts and circumstances confronting the officer without regard to intent or motivation requir[ing] a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-397 (quotation marks and citations omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.*; *Plumhoff*, 134 S.Ct. at 2020; *Ryburn v. Huff*, 132 S.Ct. 987, 992 (2012).  "[T]he reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective" and courts are "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *see Ryburn*, 132 S.Ct. at 992 (lower court erred when concluding "[w]ith the benefit of hindsight and calm

16

deliberation . . . that it was unreasonable for [the officers] to fear that violence was imminent").  Indeed, "[j]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn*, 132 S.Ct. at 991-992.  Thus, the "peace of a judge's chambers" cannot color the analysis, *Graham*, 490 U.S at 396, and courts are precluded from asking "whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam).   "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others' [citation] [,] even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.' [Citation].  The Constitution is not blind to 'the fact that police officers are often forced to make split-second judgments.' [Citation]." *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015).

A number of factors are involved in determining whether the force used was objectively reasonable, *George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013), but whether the suspect posed an immediate threat to the safety of the officers or others is by far the most important. *Id.* at 838; *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  Accordingly, deadly force is constitutional when the officer reasonably believes a suspect poses a threat of injury or death to the officer or someone else, *Brosseau v. Haugen*, 543 U.S. 194, 197-198 (2004), "at the moment when the shots were fired." *Plumhoff*, 134 S.Ct. at 2022; *see Gonzalez*, 747 F.3d at 794 ("The key issue in this case is whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat of death or serious physical injury *at the time he shot [the suspect] in the head*. That requires us to consider exactly what was happening when the shot was fired.") (emphasis added).

///

When an officer reasonably believes an immediate and serious threat exists, deadly force is constitutionally used without warning and regardless of potentially less severe alternatives. *Hayes v. Cty. of San Diego,* 736 F.3d 1223, 1233 (9th Cir. 2013); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (A reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable."); *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014) ("[E]ven assuming that it might have been possible for the officers to have given [the suspect] a wider berth . . . there is no requirement that such an alternative be explored."). Indeed, "[t]he Constitution simply does not require police to gamble with their lives in the face of serious threat of harm." *Elliot v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996). "[T]he Fourth Amendment does not require a police officer to be omniscient, and absolute certainty of harm need not precede an officer's act of self-protection." *Easley,* 890 F.3d at 857 (quotation marks, citations and edits omitted); *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.' [Citation]."); *see Saucier,* 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."). Moreover, the number of shots an officer fires is irrelevant in a reasonable force analysis. "[I]f police offers are justified in firing at a suspect … the officers need not stop shooting until the threat has ended" and, indeed, "if lethal force is justified, officers are taught to keep shooting until the threat is over." *Plumhoff*, 134 S.Ct. at 2022; *see Wilkinson*, 610 F.3d at 522 (officers are not constitutionally required to reassess threat after every shot and when "deadly force was authorized … it makes no difference … when [the officer] fired seven rounds or eleven").

18

Without dispute, deadly force is "unquestionably reasonable" if a suspect "reaches for" what is believed to be a weapon or makes some "similar threatening gesture," like getting into a "shooter's stance." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014); *see Longoria v. Pinal Cty.*, 873 F.3d 699, 706-707 (9th Cir. 2017) ("The most important question in this case is whether Rankin reasonably perceived that *Longoria assumed a threating or 'shooter's stance.' 'If [he] did, [he] w[as] entitled to shoot*; if [he] didn't, [he] [was]n't.' [Citation].") (emphasis added); *Cruz*, 765 F.3d at 1078 (police would be justified in shooting suspect behaving "dangerous[ly] and erratic[ally]" who reached for his waistband); *George,* 736 F.3d at 838 ("If the person is . . . reasonably suspected of being armed . . . a furtive movement [or] harrowing gesture . . . might create an immediate threat."); *Garcia v. United States*, 2018 WL 1448744, at *4 (C.D. Cal. Mar. 23, 2018) (Citing *George* for proposition that "[t]he reasonableness inquiry does not require an officer to have delayed their fire until a suspect turns a weapon on them" and concluding "[u]nder this standard, when an officer reasonably believes that a suspect is about to draw a firearm and shoot the officer or another person, the officer's decision to use deadly force on the suspect is not unreasonable."); *Estate of Elkins v. California Highway Patrol*, 2016 WL 3648944, at *9 (E.D. Cal. July 7, 2016) (Citing *George* and *Cruz* for the proposition that "it is not necessary that an officer's suspicion that a suspect has a gun be correct, as long as the officer reasonably perceived a sufficient threat"); *see also Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015) ("If Bynum had a gun, as the officers reasonably thought he did, they were at risk of serious injury or death and thus could reasonably consider Bynum a threat.").

ii.    **Analysis**

Here, "the videotape . . . speak[s] for itself," *Scott, supra,* 550 U.S. at 379 n. 5, and is dispositive on what occurred. *Id.* at 378-380. But there is more. The

19

testimony of the officers and witnesses conclusively proves Olango – acting erratically and refusing repeated commands to remove his hand from his pocket where a visible bulge existed – suddenly and rapidly removed his right hand from his pocket, extended his arms forward, got into a "shooting stance", and pointed an object in his hand with a metal barrel directly at Gonsalves. Olango's threatening actions required Gonsalves' immediate use of deadly force to prevent what Gonsalves reasonably believed was an imminent threat to his life. Indeed, Gonsalves, McDaniel and all independent witnesses believed Olango was pointing a gun directly at Gonsalves.

Under the facts here, Gonsalves' use of force did not violate the Fourth Amendment because *every reasonable officer* would have feared injury or death and believed deadly force was necessary to eliminate that imminent threat. *See Longoria*, 873 F.3d at 706-707 (observing officer entitled to use deadly force if suspect confronts officer in a "shooting stance"); *Easley*, 890 F.3d at 857 ("[The officer's] use of deadly force was objectively reasonable. It is an undisputed fact that [the officer] was concerned about the presence of a gun…. [The suspect] pulled an object from his right pants' pocket with his left hand and threw it away from his body. [The officer] shot [the suspect] within two to four seconds of the object leaving [his] hand. [The suspect]… threw the gun in a motion similar to throwing a Frisbee across his body; this would necessarily involve some upper body or shoulder movement. Based on these undisputed facts, a reasonable officer may have reasonably feared that [the suspect] had a gun and was turning to shoot him.").

Rozier (and Abuka) might argue Gonsalves' use of deadly force was unreasonable because Olango did not actually have a gun, but the argument would be entirely meritless for two reasons.

First, it is irrelevant that Olango did not actually have a gun because Gonsalves did not know this at the moment he fired. *Graham,* 490 U.S. at 396

20

(reasonableness determined without "20/20 hindsight"); *Hayes*, 736 F.3d at 1232-1233 ("[W]e can only consider the circumstances of which Deputies King and Geer were aware when they employed deadly force."); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) ("Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment."); s*ee Cruz*, 765 F.3d at 1078, 1079 n.3 ("[T]he fact that Cruz did not have a gun on him normally wouldn't factor into the reasonableness analysis because the officers couldn't know what was (or wasn't) underneath Cruz's waistband."); *Wilkinson*, 610 F.3d at 551 (explaining that "the critical inquiry is what [the officer] perceived"); *see also United States v. Martinez-Jimenez*, 864 F.2d 664, 668 (9th Cir. 1989) ("[Officer] must confront the risk that a replica or simulated gun creates before knowing that it presents no actual threat.").

Second, the argument necessarily ignores that Olango had something in his hand that looked like a gun, and he most certainly acted as if he had a gun by assuming a "shooting stance", pointing the "vape" barrel directly at Gonsalves while mimicking the recoil of a gun. *See Longoria*, 873 F.3d at 706-707 (observing officer entitled to use deadly force if suspect confronts officer in a "shooting stance"); (deadly force reasonable based on "furtive movement [or] harrowing gesture" ); *George*, 736 F.3d at 838; *Easley*, 890 F.3d at 857.

Indeed, a significant and uniform body of case law from the Ninth Circuit and elsewhere, including a decision by this Court, establishes the reasonableness of Gonsalves' use of deadly force is not extinguished or even diminished simply because it turned out Olango had a "vape" in his hand and not a gun. *E.g. Rodriguez v. Swartz*, 899 F.3d 719, 732-733 (9th Cir., 2018) ("[I]f a police officer shot a suspect after the suspect brandished what looked like a gun, the officer's reasonable perception that the suspect was armed would entitle the officer to qualified immunity – even if the 'gun' turned out to be a cell phone.");

21

*Corrales v. Impastato*, 650 F. App'x 540, 541 (9th Cir. 2016) (deadly force objectively reasonable under the Fourth Amendment when unarmed suspect "pull[ed] his previously concealed hand from his waistband and form[ed] it into a fist with a single, hooked finger extended"); *Barnes v. City of Pasadena*, 508 F. App'x 663, 665 (9th Cir. 2013) ("[E]ven if an issue of fact existed about the presence of a gun, the determinative issue was whether the officers reasonably believed Barnes had a gun and posed an immediate threat to safety. The record indicated that they did. The enhanced still photos from the patrol car video undisputedly show something in Barnes' hand, and Plaintiffs pointed to no evidence suggesting that the officers did not believe, or should not have believed, it to be a gun. In light of that belief, the officers used deadly force to ensure their safety. No evidence suggested any other purpose."); *Nehad v. Zimmerman*, 2017 WL 6453475, at *6-7 (S.D. Cal. Dec. 18, 2017) (deadly force reasonable under the Fourth Amendment when suspect was advancing toward officer with a metallic pen in his hand that officer believed was a knife); *Elvira v. City of Escondido*, 2016 WL 5719825, at *7-10 (S.D. Cal. Sept. 30, 2016) (Bashant, J.) (officer's use of deadly force did not violate Fourth Amendment when suspect with his hand under his sweatshirt is believed to have a knife makes a "'threatening movement' with his hand" whether or not officer's perception that suspect was removing a knife was in fact correct); *Bowles v. City of Porterville*, 2012 WL 1898911, at *1-3, 9 (E.D. Cal. May 23, 2012) (officers use of deadly force did not violate the Fourth Amendment when suspect turned toward officer with his hands extended in front of him and holding a shiny metallic and cylindric object that turned out to be a cologne bottle but officer believed was a gun), *aff'd*, 571 F. App'x 538, 539 (9th Cir. 2014) ("We affirm because the totality of the circumstances confirms that McGuire reasonably feared that Bowles was about to shoot him"); *Arian v. City of Los Angeles*, 2013 WL 12081081, at *2-3 (C.D. Cal. Apr. 30, 2013) (although suspect was only holding

22

a cell phone, officer did not violate Fourth Amendment and was justified in using deadly force because suspect "turned towards Officers . . . and extended his arms outward toward them" holding "a small dark object in his hands  [ ] pointed in the direction of Officers" because video footage established "no reasonable juror could find that [suspect's] stance did not resemble that of an individual preparing to fire a gun."), *aff'd*, 622 F. App'x 692, 692 (9th Cir. 2015) ("Arian repeatedly pointed an object that resembled a weapon towards police officers, and the officers had' probable cause to believe' that Arian 'pose[d] a significant threat of death or serious physical injury' to the officers or to the civilians at the scene."); *Hammett v. Paulding Cty.*, 875 F.3d 1036, 1051-0152 (11th Cir. 2017) ("After refusing to show his hands, [the suspect] moved aggressively toward [the officer] and raised his hands rapidly toward [the officer's] face.  'Non-compliance of this sort supports the conclusion that use of deadly force was reasonable' [Citation]. We acknowledge that here … it turned out that [the suspect] was not armed with a deadly weapon.  Nevertheless, we must view the situation from the perspective of a reasonable officer in [the officers'] position."); *Pollard,* 780 F.3d  at 400, 402-403 (deadly force objectively reasonable under the Fourth Amendment where suspect unarmed but "extended his arms and clasped [] his hands into a shooting posture, [and] pointed at the officers"); *Simmonds v. Genesee Cty.*, 682 F.3d 438, 445 (6th Cir. 2012) ("Although 20/20 hindsight now informs us that Kevin was unarmed at the time" he was "brandishing a silver object, and pointing it at the officers" so "all of the information available to the officers at the time they used force constituted probable cause that Kevin 'pose[d] a threat of serious physical harm ….' [Citation]."); *Lamont v. New Jersey*, 637 F.3d 177, 179, 183 (3rd Cir. 2011) (no Fourth Amendment violation because officers justified in using deadly force when suspect suddenly pulled his right hand out of his waistband with an object as if drawing a weapon even though object turned out to be a crack pipe); *Slattery v. Rizzo*, 939 F.2d 213, 215-216 (4th Cir. 1991) (no

23

Fourth Amendment violation because officer justified in using deadly force when officer mistook beer bottle in the suspect's hands for a weapon); *Hudspeth v. City of Shreveport*, 2006 WL 3747446, at \*3, 9-10, 12, 15 (W.D. La. Dec. 18, 2006) (no fourth amendment violation because officers justified in using deadly force when suspect "brought up both hands with both arms extended in front of him in a universally recognizable shooting stance" "while holding a small silver colored object in his hands" even though object turned out to be a cell phone), *aff'd*, 270 F. App'x 332, 337 (5th Cir. 2008) ("The Officers had an articulable basis to believe [suspect] was armed and could reasonably have perceived him as posing a threat of serious bodily harm."); *Hill v. Witt*, 2010 WL 2902246, at \*1, 3-5 (N.D. Okla. July 22, 2010) (deadly force justified under the Fourth Amendment when suspect "turned quickly toward the officers" and "swung his arm holding [a] 'black' object up" that turned out to be a cell phone); *Little v. Smith*, 114 F. Supp. 2d 437, 444-445 (W.D.N.C. 2000) (using deadly force justified under Fourth Amendment when suspect with an object in his hands took a "shooting stance" and pointed the object at the officer although object turned out to be a dumbbell).

Rozier (and Abuko) might argue Olango was mentally ill. Assuming that can be proved, any mental impairment Olango may have had does not render Gonsalves' use of deadly force objectively unreasonable under the facts of this case. *See Sheehan*, 135 S.Ct. at 1778 (noting consensus of cases hold that officers not required to treat mentally ill suspects differently). The Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829; *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."). Where, as here, "in the midst of a rapidly escalating situation, the officers cannot be faulted for failing to diagnose [a mental condition]. Indeed,

the volatile nature of a situation may make a pause for psychiatric diagnosis impractical and even dangerous." *Bates v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000). The reality is that "[k]nowledge of a person's disability simply cannot foreclose officers from protecting themselves . . . when faced with threatening conduct by the disabled individual." *Id.; see Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) ("Even if William were mentally ill, and the officers knew it, William's mental state does not change the fact he posed a deadly threat to the officers.").

Finally, Rozier (and Abuka) might argue Gonsalves used "bad tactics", violated training, policy or procedure, or "provoked" Olango into the conduct necessitating the use of deadly force. The argument is legally invalid. As the Supreme Court said in *Sheehan*: "[E]ven if an officer acts contrary to her training, however, ... a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.' [Citation]; *Cf. Saucier v. Katz*, 533 U.S. 194, 216, n. 6, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (GINSBURG, J., concurring in judgment) ('[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently' [Citation].)" 135 S. Ct. at 1777; *see George v. Morris*, 736 F.3d 829, 839 n. 14 (9th Cir. 2013) (irrelevant in a Fourth Amendment reasonableness analysis whether officer's conduct leading up to a deadly confrontation was "imprudent, inappropriate, or even reckless"). Further, the Supreme Court rejected the "provocation doctrine" in *Cty. of Los Angeles v. Mendez,* 137 S.Ct. 1539 (2017), holding that a reasonable use of force cannot become unreasonable because the officer's conduct preceding the use of force created a situation necessitating the use of force even if the prior conduct itself violated the Fourth Amendment. *Id.* at 1543, 1544, 1546-1547; *Isayeva v.*

25

*Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017) ("At oral argument, Isayeva's counsel stated that she was also proceeding on a 'provation theory' of liability. The Supreme Court recently held that the Fourth Amendment provides no basis for such a theory. [Citation]."); *Estate of Serrano v. Trieu*, 713 F. App'x 631, 632 (9th Cir. 2018) ("Deputy Trieu is not liable based on events antecedent to the shooting. The Supreme Court rejected this court's provation doctrine in [*Mendez*]."); *Knox v. City of Fresno*, 708 F. App'x 321, 323 (9th Cir. 2017) (citing *Mendez* for proposition that in an excessive force analysis "[t]he reasonableness of the officer's prior actions and decisions are not to be taken into account"); *Burns v. City of Concord*, 2017 WL 5751407, at *10 (N.D. Cal. Nov. 28, 2017) ("As the Supreme Court had recently clarified, an excessive-force claim cannot be based on a 'provocation' theory that police officers committed other Fourth Amendment violations prior to the use of force that escalated the situation and thereby provoked a violent confrontation that resulted in the use of force.").

Finally, Rozier (and Abuka) may argue that deadly force is not appropriate to achieve compliance with the command to remove Olango's right hand from his pocket. Such an argument fails badly because there is zero evidence to suggest Gonsalves was going to use *any* force to gain compliance. Gonsalves only used used force *after* Olango took the shooting stance.

**b.      Step Two: No Clearly Established Law Existed On September 27, 2016 Telling All Reasonable Officers That Deadly Force Under The Facts Of This Case Would Violate The Fourth Amendment**

It is Rozier's burden to show clearly established law. *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

Rozier bears a heavy burden. This is not a rare case involving obviously unconstitutional misconduct, and Rozier cannot establish otherwise. *See Mattos*, 661 F.3d at 442 ("the bar for finding such obviousness is quite high"). Indeed, "[t]his is far from an obvious case in which any competent officer would have

26

known that shooting [Olango] to protect [himself] would violate" a constitutional right. *Kisela,* 138 S. Ct. at 1153.

Because this is not an obvious case of unconstitutional conduct, "[Rozier] must '*identify a case* where an officer acting under similar circumstances as [Gonsalves] was held to have violated the Fourth Amendment.' [Citation]." *Sharp v. Cty. of Orange*, 871 F.3d. 901, 911 (9th Cir. 2017); *but see Horstman v. City of Hillsboro*, 2018 WL 1736046, at *1 (9th Cir. Apr. 11, 2018) (unpub.) ("[T]he Supreme Court has recently cautioned against the 'reli[ance] on a single decision' in determining whether a constitutional right was clearly established by 'settled law.' *See District of Columbia v. Wesby*, [ ] 138 S.Ct. 577, 591, [ ] (2018).")

"In other words, [Rozier] must point to prior case law that articulates a constitutional rule specific enough to alert *[Gonsalves] in this case* that *[his] particular conduct* was unlawful." *Sharp*, 871 F.3d at 911. "To achieve that kind of notice, the prior precedent must be controlling-from the Ninth Circuit or Supreme Court-or otherwise be embraced by a consensus of courts outside the relevant jurisdiction."[9] *Id.*; *Shafer*, 868 F.3d at 1117 ("We are mindful of the Supreme Court's pronouncement in *White v. Pauly* that, to satisfy this step in the qualified immunity analysis, we generally must 'identify a case where an officer acting under similar circumstances as [the officer] was held to have violated the Fourth Amendment'.").

A proper "clearly established" analysis requires "defin[ing] the law at issue in a concrete, particularized manner." *Felarca*, 891 F.3d at 822; *Shafer*, 868 F.3d at 1117. As the Supreme Court very recently reiterated:

> '[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that

---

[9] For purposes of this motion only, defendants accept that Ninth Circuit decisions can constitute clearly established law. *See Kisela*, 138 S. Ct. at 1153 ("[E]ven if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here.").

it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.' [Citation]. Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue. [Citation].

*Kisela,* 138 S.Ct. at 1152; *Wesby*, 138 S.Ct. at 590; *see Ames v. King Cty.,* 846 F.3d 340, 347 (9th Cir. 2017) ("[F]actual specificity is especially important in the Fourth Amendment context.") (quotation marks and citations omitted).

Accordingly, Rozier must cite a Supreme Court or Ninth Circuit case - or a series of cases from other courts placing the matter beyond debate - holding that an officer violates the Fourth Amendment when the officer shoots an erratically acting suspect that repeatedly ignored commands to remove his hand from pocket where a visible bulge exists after the suspect suddenly removes his hand from his pocket, gets into a shooter's stance and points an object resembling a gun with a visible metal barrel directly at the officer. *See e.g., Felarca*, 891 F.3d at 822. ("We define the law at issue here as follows: whether an officer violates clearly established law when, after several warnings to disperse have been given, the officer uses baton strikes on a plaintiff's torso or extremities for the purpose of moving a crowd actively obstructing the officer from carrying out lawful orders in a challenging environment. To meet their burden, plaintiffs must generally identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment."); *Shafer*, 868 F.3d at 1117 ("Defined at an appropriate level of specificity, the question at hand is whether an officer violates clearly established law when he progressively increases his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders and resists, obstructs, or delays the officer in his lawful performance of duties such that the officer has probable cause to arrest him in a challenging environment.").

Rozier cannot meet her burden because no court has ever held that the use of deadly force under the *specific facts of this case* violates a suspect's Fourth Amendment rights. Thus, no clearly established law existed on September 27, 2016, that would allow this Court to conclude only an incompetent officer or one knowingly violating the law would have acted as Gonsalves did under the specific facts and circumstances of this case. See *Nehad*, 2017 WL 6453475, at *8-10 (not clearly established in August 2015 that it would violate the Fourth Amendment to use deadly force against an approaching suspect holding and refusing to drop a metal object in his hand that officer believed was a gun but turned out to be a pen).

## 2. Detention Based Claim

### a. Step One: No Pre-Shooting Detention In Violation Of The Fourth Amendment

Rozier alleges Gonsalves "contacted" Olango, and "violently confronted" him "by approaching" Olango "with his firearm drawn and detaining [him] at gunpoint." No. 17-cv-00347, Doc. No. 5, p.10, ¶ 5. Despite this being factually wrong, it appears Rozier makes a pre-shooting seizure claim.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). A Fourth Amendment seizure occurs "when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations omitted). A seizure short of arrest is a detention, requiring reasonable suspicion of a committed or impending crime, that a person is armed, or the person presents a danger. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Charley*, 396 F.3d 1074, 1079 (9th Cir. 2005).

Gonsalves did not seize Olango when he initially approached him. A seizure "does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A seizure occurs only when a reasonable person would believe he was not free to leave and there is "some form of 'touching or submission.'" *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (quoting *California v. Hodari D.*, 499 U.S. 621, 626-628 (1991); *United States v. Smith*, 633 F.3d 889, 892-893 (9th Cir. 2011) ("In the absence of physical force, in order to constitute a seizure, an officer's show of authority must be accompanied by 'submission to the assertion of authority.'") (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Gonsalves never touched Olango, Gonsalves Depo., p. 97:11-20, and at no time did Olango submit to Gonsalves' authority as he steadfastly ignored Gonsalves' commands to remove his hand from his pocket and continually walked away. *McClendon*, 713 F.3d at 1215-1217 (no seizure when individual "was ordered at gunpoint to stop and put up his hands" but instead "turned and walked away, not raising his hands").

Even assuming a seizure, Gonsalves had reasonable suspicion to believe Olango committed a crime when he refused to remove his hand from his pocket. *Smith v. City of Hemet*, 394 F.3d 689, 697 (9th Cir. 2005) (en banc) (refusing to comply with orders to remove hands from pockets constitutes a violation of California Penal Code § 148(a)(1)). Gonsalves also had reasonable suspicion to believe Olango was armed, given the observable bulge in Olango's pocket, Olango's refusal to remove his hand from the pocket, and his erratic and evasive movements. *United States v. Edwards*, 761 F.3d 977, 981–982 (9th Cir. 2014) (officers had reasonably suspicion to detain suspect by pointing weapons at him when they had reasonable suspicion that he was armed); *United States v. Flatter*, 456 F.3d 1154, 1157-1158 (9th Cir. 2006) ("Our prior cases have identified a wide variety of factors that can support a reasonable belief that an individual is

30

armed. For example, we have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon. [Citations] We have also considered sudden movements by defendants, or repeated attempts to reach for an object that was not immediately visible, as actions that can give rise to a reasonable suspicion that a defendant is armed."); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

**b.      Step Two: No Clearly Established Law Existed On September 27, 2016 Telling All Reasonable Officers That Any Pre-Shooting Detention Violated The Fourth Amendment Violation**

No case existed as of September 27, 2016, putting all reasonable officers on notice that what Gonsalves did, under the specific facts of this case, constituted a detention of Olango in violation of the Fourth Amendment.

**B.      Abuka's Fourteenth Amendment Claims[10]**

**1.      Step One:  No Fourteenth Amendment Violation Because No Underlying Fourth Amendment Violation And No Conscience Shocking Conduct**

The parent of a person killed by police can assert a Fourteenth Amendment substantive due process claim for the loss of familial association. *Wilkinson,* 610 F.3d at 554.  Because substantive due process is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998), a parent maintaining such a claim bears the onerous burden of establishing the officer's conduct "shocked the conscience." *Id.* at 846-848.

Negligent conduct does not shock the conscience. *Lewis*, 523 U.S. at 849. Nor does conduct constituting a "conscience disregard" for one's life. *Moreland*

---

[10] Although Abuka's claims are expressly based on the Fourteenth Amendment, No. 17-cv-00089, Doc. No. 6, ¶¶ 29, 38, his complaint does mention the First Amendment. *Id.* at ¶2.  This stray reference does not allege a First Amendment based interference with familial association claim.  But even if it did, the analysis is the same as the Fourteenth Amendment claim. *Kaur v. City of Lodi*, 263 F.Supp. 947, 973-974 (E.D. Cal. 2017).

31

*v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). Indeed, "only the most egregious official conduct" is conscience shocking and conscience shocking conduct is only that conduct violating the "decencies of civilized conduct." *Lewis*, 523 U.S. at 846. The "shocks the conscience" standard describes conduct that is "so 'brutal' and 'offensive' that it does not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957); *see, e.g., Zion v. Cty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) ("head-stomping a suspect curled up in the fetal position" "is exactly the kind of 'brutal conduct the Due Process Clause protects against" as it 'is bound to offend even hardened sensibilities.'")

"In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.' [Citation]." *Wilkinson*, 610 F.3d at 554. Where time exists for actual deliberation, "deliberate indifference" may suffice to shock the conscience. *Zion,* 874 F.3d at 1077. But in fast paced situations where an officer makes "snap judgments" in reaction to rapidly changing circumstances, an officer's conduct is not conscience shocking unless the officer acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id.*; *Gonzalez*, 747 F.3d at 797; *Hayes,* 736 F.3d at 1230; *Wilkinson*, 610 F.3d at 554; *Elvira*, 2016 WL 5719825, at *13 (Bashant, J). In the later, Fourteenth Amendment liability exists only in the "rare situations" where "the officer intended to harm, terrorize or kill" the suspect without regard for a legitimate law enforcement objective, *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008), or where the officer intended "to bully a suspect or get even." *Wilkinson*, 610 F.3d at 554; *see e.g., Zion*, 874 F.3d. at 1077.

### a.    No Underlying Fourth Amendment Violation

A Fourteenth Amendment loss of familial association claim requires an underlying violation of the family member's constitutional rights. *Gausvik v.*

32

*Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004); *Schaefer v. Goch*, 153 F.3d 793, 799 (7th Cir. 1998); *Schwarz v. Lassen Cty.*, 2013 WL 5425102, at *20-21 (E.D. Cal. Sept. 27, 2013), *affd.*, 628 Fed. Appx. 527, 528 (9th Cir. 2016); *Estate of Wasilchen v. Gohrman*, 870 F. Supp. 2d 1115, 1139 (W.D. Wash. 2012), *affd.* 539 Fed. Appx. 788 (9th Cir. 2013).

Abuka's Fourteenth Amendment claim is based solely on violations of Olango's Fourth Amendment rights to be free from excessive force and to receive adequate medical care.  As established *ante*, Gonsalves did not violate Olango's Fourth Amendment rights when using deadly force.  And as established here, Gonsalves did not violate Olango's Fourth Amendment right to adequate medical care.

Medical care claims for those injured by law enforcement at the scene of an incident, like Olango, are governed by the Fourth Amendment.  *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098-1099 (9th Cir. 2006).  An officer must provide objectively reasonable medical care, and the Fourth Amendment is satisfied when an officer promptly summons medical care for the injured person.  *Id.* at 1099.  Here, Gonsalves requested medical care for Olango as soon as he shot him, and medical care was on the scene and providing care to Olango within minutes.

**b.     Assuming An Underlying Fourth Amendment Violation, No Conscience Shocking Conduct Existed Because Gonsalves' Use Of Force In Fast Paced Circumstances Served The Legitimate Law Enforcement Objective Of Self-Protection**

Just over a minute elapsed between Gonsalves' first contact with Olango and the shooting, and a lot happened in that short time.  Gonsalves Decl., ¶¶ 7-17; No. 17-cv-00089, ECF No. 6, ¶ 20 (Abuka alleging the incident, from start to finish, lasted less than one minute).  And Gonsalves' decision to shoot Olango was most certainly instantaneous.  Thus, the purpose to harm standard clearly applies.  *Porter*, 546 F.3d at 1139 (purpose to harm standard applied during five-

33

minute altercation between the officers and victim evolved quickly and forced the officers to make "repeated split-second decisions."); *Billington v. Smith,* 292 F.3d 1177, 1191 (9th Cir. 2001) (150 seconds "is not a comfortably ample period" for deliberation), *abrogated on the grounds, Mendez, supra*, 137 S. Ct. 1539; *Atkinson v. Cty. of Tulare*, 790 F. Supp. 2d 1188, 1208 (E.D. Cal. 2011) ("Here, the entire incident lasted only a few minutes. Because Detective Seymour made snap judgments without time for deliberation, his conduct will only shock the conscience if he acted 'with a purpose to harm unrelated to legitimate law enforcement objectives.'); *see e.g., Elvira*, 2016 WL 5719825, at *13 (Bashant, J.) ("Once the situation escalated and Mr. Campos started rushing at Officer Hand, it is undisputed that both Officer Hand and Officer Fuentes 'only had 1-2 seconds to make the decision to shoot.' [Citation]. Therefore, both Officer Hand and Officer Fuentes 'did not have time to deliberate,' and their 'use of force shocks the conscience only if the officers had a 'purpose to harm' [Mr. Campos] for reasons unrelated to legitimate law enforcement objectives.' [Citation].").

"The purpose to harm standard is a subjective standard of culpability." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). "It is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983. . . ." *Porter*, 546 F.3d at 1140. Self-protection is a legitimate law enforcement objective. *A.D.,* 712 F.3d at 454; *Moreland*, 159 F.3d at 373; *Fewell v. California*, 2017 WL 6043080, at *6 (C.D. Cal. Apr. 11, 2017).

Gonsalves shot Olango because Olango suddenly removed from his pocket what Gonsalves thought was a gun, got into a shooter's stance, and pointed the object directly at him. The evidence therefore conclusively demonstrates that Gonsalves' use of force was not conscience shocking but unquestionably related to the legitimate law enforcement objective of (reflexive) self-protection. *A.D.,*

34

712 F.3d at 454; *see also Menjivar v. City of Los Angeles*, 2007 WL 4662062, at *9 (C.D. Cal. July 24, 2007) ("[T]he Ninth Circuit has recognized that '[r]eflexive conduct in situations demanding immediate law-enforcement response generally does not constitute conduct that is considered to 'shock the conscience' within the meaning of the Fourteenth Amendment jurisprudence.' *Parker v. City of Pomona*, 67 Fed. Appx. 1001, 1001 (9th Cir. June 3, 2003) (Unpub.Disp.).").

Moreover, Gonsalves did not know Olango, harbored no ill will toward him, and did not use deadly force to get even with Olango for anything. Gonsalves Decl., ¶ 20. And Abuka certainly cannot present any evidence of a motive by Gonsalves for shooting Olango other than self-protection. *See Gonzalez*, 747 F.3d at 797-798 (affirming summary judgment on Fourteenth Amendment claim because plaintiffs produced no evidence of ulterior motives underlying use of force); *Hayes*, 736 F.3d at 1230-1231 (affirming summary judgment on Fourteenth Amendment claim because there was no evidence that the deputies fired their weapons for any purpose other than self-defense).

Finally, numerous cases established that the fact Olango was holding a "vape" and not an actual weapon does not alter the conclusion that Gonsalves' use of deadly force was related to a legitimate law enforcement objective. *E.g.*, *Elvira*, 2016 WL 5719825, at *7-10, 14 (Bashant, J.) (no Fourteenth Amendment violation; officer's use of deadly force related to legitimate law enforcement objective when suspect with his hand under his sweatshirt believed to have a knife makes a "'threatening movement' with his hand" whether or not officer's perception that suspect was removing a knife was in fact correct); *Centeno v. City of Fresno*, 2017 WL 3730400, at *1-3, 9-10 (E.D. Cal. Aug. 30, 2017) (no Fourteenth Amendment violation resulting from officer's use of deadly force; use of deadly force related to a legitimate law enforcement objective when officer mistakenly believed a black plastic spray nozzle was a weapon); *Bowles,* 2012

35

WL 1898911, at *1-3, 10-11 (no Fourteenth Amendment violation resulting from officer's use of deadly force; officer's use of force related to a legitimate law enforcement objective when suspect turned toward officer with his hands extended in front of him and holding a shiny metallic and cylindric object that turned out to be a cologne bottle but officer believed was a gun), *aff'd*, 571 F. App'x 538, 539 (9th Cir. 2014) ("We affirm because the totality of the circumstances confirms that McGuire reasonably feared that Bowles was about to shoot him"); *Collender v. City of Brea*, 2013 WL 11316942, at *1-2, 9 (C.D. Cal. Mar. 4, 2013) (no Fourteenth Amendment violation resulting from officer's use of deadly force; officer's use of force related to legitimate law enforcement objective when officer mistakenly believed suspect was pulling weapon from his pants pocket).

**2.     Step Two:  No Clearly Established Law Existed On September 27, 2016 Telling All Reasonable Officers That Deadly Force Under The Facts Of This Case Would Violate The 14th Amendment**

It is Abuka's burden to identify a case from the Supreme Court or the Ninth Circuit - or a series of cases from other courts placing the matter beyond debate - holding that an officer violates the 14th Amendment rights of a suspect's family member when the officer shoots an erratically acting suspect that had several times ignored commands to remove his hand from pocket, and then suddenly removes his hand from his pocket, and gets into a shooter's stance, pointing an object resembling a gun with a visible metal barrel directly at the officer.  *See Felarca*, 891 F.3d at 822.  Abuka cannot do this because no court has held that the use of deadly force under the particular facts of this case violates the Fourteenth Amendment rights of family members.

///

///

///

///

**SUMMARY JUDGMENT IS APPROPRIATE ON ROZIER'S FAILURE TO TRAIN BASED *MONELL* CLAIM**

**A.     No Underlying Fourth Amendment Violation**

There is no municipal liability under *Monell* absent an underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curium). As discussed *ante*, Gonsalves' use of force did not violate Olango's Fourth Amendment rights.

**B.     Assuming A Fourth Amendment Violation, No Failure To Train Was The Moving Force Behind The Violation**[11]

The City cannot be vicariously liable for the unconstitutional acts of its employees. *Monell*, 436 U.S. at 694. Thus, "[p]laintiffs who seek to impose liability on local governments under [section] 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (failure to train must be "the moving force [behind] the constitutional violation"). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. But "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. [Citation]." *Id.* The "failure to train … must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' [Citation]." *Id.; City of Canton,* 489 U.S. at 388. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or

---

[11] Failure to train is the sole basis on which Rozier seeks to hold the City liable under *Monell*.

obvious consequence of his action.' [Citation]." *Connick,* 563 U.S. at 61; *City of*
*Canton* 489 U.S. at 390 (municipal liability exists "where – and only where – a
deliberate choice to follow a course of action is made from among various
alternatives").

"That a particular officer may be unsatisfactorily trained will not alone
suffice to fasten liability on the city…." *City of Canton,* 489 U.S. 390-391; *see*
*Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011) ("[m]ere
negligence in training or supervision [ ] does not give rise to a *Monell* claim").
Nor is it sufficient to show isolated or sporadic events attributable to a failure to
train. *Blankenhorn v. City of Orange*, 485 F.3d 463, 464 (9th Cir. 2007); *Case v.*
*Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 932 (9th Cir. 2011). Rozier
accordingly must prove "the need for more or different training was so obvious,
and the inadequacy so likely to result in the violation of constitutional rights, that
the policymakers of the city can reasonably be said to have been deliberately
indifferent to the need." *City of Canton*, 489 U.S. at 390; *see Hunter v. Cty. of*
*Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (explaining *Monell* liability
cannot be "predicated on isolated or sporadic incidents" and that "[t]he custom
must be so 'persistent and widespread' that it constitutes a 'permanent and well
settled city policy.'[Citation]").

Because the City trains its officers on the use of force, Gonsalves Decl., ¶
21; Gonsalves Depo., pp. 16:25-18:18, 24:18-24:19, 29:11-33:6, 48:17-50:21,
McDaniel Depo., pp. 15:18-24:2, Rozier must prove a pattern of similar
constitutional violations tied to a known training deficiency such that the
training, or lack thereof, constitutes the moving force behind the constitutional
violation. *Connick,* 563 U.S. at 62-64; *City of Canton*, 489 U.S. at 389, 392. She
cannot. Rozier's discovery responses demonstrate her inability to prove repeated
instances of unconstitutional uses of force caused by deficient training as the
responses are devoid of anything other than mere allegations based on

38

1  information and belief.  Exhs. M-P to Notice of Lod.  Indeed, Rozier fails to

2  identify any other specific instance of unconstitutional force committed by any

3  City officer. *Id.*

## VI.

## CONCLUSION

This Court should grant Gonsalves and the City summary judgment on

Rozier's and Abuka's claims.

Qualified immunity mandates summary judgment on the Fourth

Amendment based section 1983 claims asserted against Gonsalves by Rozier.

Gonsalves' use of force did not violate Olango's Fourth Amendment rights and

the law was not so clearly established in September 2016 that all reasonable

officers would have known Gonsalves' use of force violated the Fourth

Amendment.  To the extent that Rozier makes a pre-shooting detention based

Fourth Amendment claim, it fails because Gonsalves' conduct did not violate the

Fourth Amendment and no clearly established law existed at the time

demonstrating any unconstitutional conduct.  Summary judgment for the City on

Rozier's failure to train based *Monell* claim is proper because there was no

underlying violation of Olango's Fourth Amendment rights and there is no

evidence establishing any problems with the City's training, much less evidence

establishing the City was deliberately indifferent to the rights of citizens.

Qualified immunity also mandates summary judgment on Abuka's

Fourteenth Amendment claim because Gonsalves' use of force did not violate

Olango's Fourth Amendment rights and Gonsalves did not violate Olango's

Fourth Amendment right to adequate medical care.  Moreover, the evidence

establishes that Gonsalves had no intent to harm Olango unrelated to the

legitimate law enforcement objective of self-protection.  Further, no clearly

established law existed in September 2016, that would have put all reasonable

///

39

officers on notice that Gonsalves' conduct violated Abuka's Fourteenth Amendment rights.

Respectfully submitted,

Dated: October 1, 2018                    Daley & Heft, LLP

                                          By: <u>/s/ Lee H. Roistacher</u>
                                              Mitchell D. Dean
                                              Lee H. Roistacher
                                              Heather E. Paradis
                                              Garrett A. Smee
                                              Attorneys for Defendants
                                              City of El Cajon and Richard
                                              Gonsalves

                                          E-mail:  mdean@daleyheft.com
                                                   lroistacher@daleyheft.com
                                                   hparadis@daleyheft.com
                                                   gsmee@daleyheft.com

40