**BRIAN T. DUNN, ESQ. (SBN 176502)**
Email: bdunn@cochranfirm.com
**MEGAN R. GYONGYOS, ESQ. (SBN 285476)**
Email: mgyongyos@cochranfirm.com
**THE COCHRAN FIRM CALIFORNIA**
4929 Wilshire Boulevard, Suite 1010
Los Angeles, California 90010-3856
Telephone: (323) 435-8205
Facsimile: (323) 282-5280

Attorneys for Plaintiffs TAINA ROZIER, C.O., and H.C.

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD OLANGO ABUKA, et al., | **CASE NO.: 17-cv-89-BAS-NLS** |
| Plaintiffs, | (Consolidated with Case No. 17-cv-347-BAS-NLS) |
| v. | |
| CITY OF EL CAJON, et al., | **PLAINTIFFS TAINA ROZIER, C.O., AND H.C.'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Defendants. | |

[Declaration of Brian T. Dunn, Notice of Lodgment of Exhibits and Exhibits 1-12, and Request for Judicial Notice and Exhibits A-D filed concurrently herewith under separate cover]

Date:       November 5, 2018
Ctrm:      4B
Judge:     Hon. Cynthia Bashant

**TO THIS HONORABLE COURT, AND TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on November 5, 2018, or as soon thereafter as this matter may be heard in Courtroom 4B of the United States District Court for the Southern District of California, located at 221 West Broadway in San Diego, California, Plaintiffs TAINA ROZIER, C.O., and H.C. will and hereby do OPPOSE Defendants' Motion for Summary Judgment as to Plaintiffs' Fourth Amendment excessive force claim.

This Opposition is based upon this Notice, the attached Memorandum of Points and Authorities, the Declaration of Brian T. Dunn filed concurrently herewith under separate cover, Exhibits 1 through 12 lodged concurrently herewith under separate cover, the Request for Judicial Notice and Exhibits A-D filed concurrently herewith under separate cover, the file and records of the within action, and any such additional oral or documentary evidence as may be evaluated by the Court at the hearing of this matter.

DATED: October 22, 2018          Respectfully submitted,

**THE COCHRAN FIRM CALIFORNIA**


By: /s/ Brian T. Dunn
                                         BRIAN T. DUNN
                                         MEGAN R. GYONGYOS
                                         Attorneys for Plaintiffs TAINA ROZIER,
                                         C.O., and H.C.
                                         Email: bdunn@cochranfirm.com
                                         Email: mgyongyos@cochranfirm.com

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*The "5150" Call Regarding Alfred Olango* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*The Events Preceding the Fatal Shooting of Alfred Olango* . . . . . . . . . . . . . . . . . 2

*Officer Gonsalves' Version of Events Surrounding the Shooting* . . . . . . . . . . . . . . 4

*Officer McDaniel's Version of Events Surrounding the Shooting* . . . . . . . . . . . . . . 5

*The Testimony of Lucy Olango, Lakenya Lanier, and Leony Ket* . . . . . . . . . . . . . . 6

*The Video Recordings Depicting the Shooting* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*The Locations and Trajectories of the Gunshot Wounds that Alfred Olango Sustained* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*The Vaping Device Recovered at the Scene of the Shooting and the Bullet Impact on the Front Bumper of the Pickup Truck* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*The Officers' Training Regarding the Use of Deadly Force and Field Contacts with Mentally Unstable Subjects* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR VIOLATIONS OF ALFRED OLANGO'S FOURTH AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . 14

      A.    When Officer Gonsalves Shot Mr. Olango, He Violated Mr. Olango's Fourth Amendment Right to Be Free from Unreasonable Seizures . . . 14

      B.    The Testimony of the Medical Examiner Demonstrates That Mr. Olango Could Have Been Positioned in the Threatening Manner That Officer Gonsalves Describes Throughout the Time in Which Officer Gonsalves Was Firing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

///

///

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

C.    There Are Material Factual Disputes Concerning the Reasonableness of Officer Gonsalves' Belief That Mr. Olango Had a Firearm in His Hands. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.    All Other Relevant Factors Weigh in Favor of a Finding That Officer Gonsalves Used Excessive Force Against Mr. Olango. . . . . . . . . . . . . 22

E.    The Fourth Amendment Does Not Allow an Officer to Use Deadly Force Against an Individual Who is Armed with a Weapon But is Not Facing the Officers, is Turning Away from The Officers, or is in the Process of Falling to the Ground When the Officer Fires His Weapon. . . . . . . . 23

F.    The Cases Defendants Rely On Are Factually Distinguishable. . . . . . 24

G.    The San Diego County Superior Court Has Determined That There are Genuine Issues of Fact Concerning the Reasonableness of Officer Gonsalves' Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.    OFFICER GONSALVES  IS NOT ENTITLED TO QUALIFIED IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    The Determination of Whether Officer Gonsalves is Entitled to Qualified Immunity is Premature Because There Are Material Factual Disputes Concerning the Reasonableness of His Repeated Use of Deadly Force. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    Officer Gonsalves Violated Mr. Olango's Clearly Established Fourth Amendment Rights When He Shot Mr. Olango. . . . . . . . . . . . . . . . 34

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

**Federal Cases**

*Arian v. City of Los Angeles*
    2013 U.S. Dist. LEXIS 192420 (C.D. Cal. April 30, 2013). . . . . . . . . . . . . . . 25, 27

*Barnes v. City of Pasadena*
    508 F. App'x 663 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27, 29

*Bowles v. City of Porterville*
    2012 U.S. Dist. LEXIS 71996 (E.D. Cal. May 23, 2012). . . . . . . . . . 24, 25, 27, 29

*Bui v. City & County of San Francisco*
    699 Fed. App'x 614 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33

*Burns v. City of Redwood*
    737 F. Supp. 2d 1047 (N.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Chien Van Bui v. City & County of San Francisco*
    61 F. Supp. 3d 877 (N.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 35

*Clark v. Bear Stearns & Co.*
    966 F.2d 1318 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Corrales v. Impastato*
    650 F. App'x 540 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 28

*Cruz v. City of Anaheim*
    765 F.3d 1076 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Curnow v. Ridgecrest Police*
    952 F.2d 321 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 35

*Deorle v. Rutherford*
    272 F.3d 1272 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Elvira v. City of Escondido*
    2016 U.S. Dist. LEXIS 136215 (S.D. Cal. Sept. 30, 2016). . . . . . 24, 26, 27, 29, 30

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Espinosa v. City & County of San Francisco*
    598 F.3d 528 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Foster v. Runnels*
    554 F.3d 807 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*George v. Morris*
    724 F.3d 1191 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*Glenn v. Washington County*
    673 F.3d 864 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 32

*Gonzalez v. City of Anaheim*
    747 F.3d 789 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Graham v. Connor*
    490 U.S. 386 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 22

*Gravelet-Blondin v. Shelton*
    728 F.3d 1086 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hammett v. Paulding County*
    875 F.3d 1036 (11th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Hayes v. County of San Diego*
    736 F.3d 1223 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Harris v. Roderick*
    126 F.3d 1189 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Headwaters Forest Def. v. County of Humboldt*
    240 F.3d 1185 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Herrera v. Las Vegas Metro. Police Dep't*
    298 F. Supp. 2d 1043 (D. Nev. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hill v. Witt*
    2010 U.S. Dist. LEXIS 74655 (N.D. Okla. July 22, 2010). . . . . . . . . . . . . . 25, 26

*Hudspeth v. City of Shreveport*
    2006 U.S. Dist. LEXIS 91053 (W.D. La. Dec. 18, 2006). . . . . . . . . . . . 25, 26, 27

*Lamont v. New Jersey*

    673 F.3d 177, (3d Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Leslie v. Grupo ICA*

    198 F.3d 1152 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Little v. Smith*

    114 F. Supp. 2d 437 (W.D.N.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Nehad v. Zimmerman*

    2017 U.S. Dist. LEXIS 208537 (S.D. Cal. Dec. 18, 2017). . . . . . 24, 25, 26, 27, 29

*Nelson v. City of Davis*

    685 F.3d 867 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McCloskey v. Courtnier*

    2012 U.S. Dist. LEXIS 25493 (N.D. Cal. Feb. 28, 2012). . . . . . . . . . . . . . . . 33

*Mullenix v. Luna*

    136 S. Ct. 305 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pearson v. Callahan*

    555 U.S. 223 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pollard v. City of Columbus*

    780 F.3d 395 (6th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28

*Santos v. Gates*

    287 F.3d 846 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 32

*Saucier v. Katz*

    533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*S.B. v. County of San Diego*

    864 F.3d 1010 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Scott v. Henrich*

    39 F.3d 912 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Simmonds v. Genesee County*

    682 F.3d 438 (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Slattery v. Rizzo*
      939 F.2d 213 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Smith v. City of Hemet*
      394 F.3d 689 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tennessee v. Garner*
      471 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wilkins v. City of Oakland*
      350 F.3d 949 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Federal Rules**

Fed. R. Civ. P. 56.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**THE**
**COCHRAN**
**FIRM**
**CALIFORNIA**
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

## MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF THE EVIDENCE

On the afternoon of September 27, 2016, Defendant Officer Richard Gonsalves ("Officer Gonsalves") shot Plaintiffs' decedent, Alfred Okwera Olango ("Alfred Olango" or "Mr. Olango"), outside the Los Panchos taco shop located at 777 Broadway in El Cajon, California. (Exhibit 1 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Officer Richard Gonsalves ["Gonsalves Depo."], at 65:6-11; Declaration of Richard Gonsalves, Dkt. No. 54–2 ["Gonsalves Decl."], ¶ 17.) Gonsalves fired four rounds at Mr. Olango during the incident. (Exhibit 1, Gonsalves Depo., at 13:15-16.) Mr. Olango was not armed with any kind of weapon at the time of the shooting. (Exhibit 8 to Plaintiffs' Notice of Lodgment of Exhibits, Laboratory Report.) The shooting of Mr. Olango occurred approximately one minute and thirty-three seconds after Gonsalves made contact with him. (Exhibit 1, Gonsalves Depo., at 55:2-6; Gonsalves Decl., ¶¶ 8, 17; Exhibit A to Gonsalves Decl., Dispatch Recordings; Exhibit B to Gonsalves Decl., Call for Service Detail Report, at p. 17.)

### The "5150" Call Regarding Alfred Olango

At 2:03 p.m. on September 27, 2016, a "5150"[1] call was dispatched over the El Cajon Police Department's radio frequency. (Exhibit A to Gonsalves Decl., Dispatch Recordings.) The call asked Officer Gonsalves and Officer Stephen McDaniel ("Officer McDaniel") to respond to the Arco gas station at 871 North Mollison in reference to a "5150" subject who had been seen "walking into traffic." (Exhibit A to Gonsalves Decl., Dispatch Recordings.) Additional information about the call was also put out on the computers in Gonsalves' and McDaniel's patrol vehicles between 12:57 p.m. and 2:01 p.m. (Exhibit B to Declaration of Norma Cabana, Dkt. No. 54-3 ["Cabana Decl."],

---

[1] The term "5150" is a generic term for a call involving a subject who may be mentally ill, or is having a mental breakdown call (Exhibit 1, Gonsalves Depo., at 44:9-11.)

**THE COCHRAN FIRM CALIFORNIA**
4929 Wilshire Bl.
Suite 1010
(323)435-8205

Call for Service Detail Report, at p. 6; Exhibit 2 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Officer Stephen McDaniel ["McDaniel Depo."], at 32:12-33:15, 35:21-36:5, 110:22-111:5.) The call details stated that the subject's name was Alfred Olango, and that the person who had called about Mr. Olango was one of his siblings, and that Mr. Olango was mentally unstable, was walking in traffic, and was almost getting hit by cars. (Exhibit B to Cabana Decl., Call for Service Detail Report, at p. 6.) The call details also included an entry at 12:58 p.m. which stated "no weapons." (Exhibit B to Cabana Decl., Call for Service Detail Report, at p. 6.)

Officers Gonsalves and McDaniel recall receiving information which indicated that Mr. Olango was mentally unstable. (Exhibit 1, Gonsalves Depo., at 43:22-44:11; Exhibit 2, McDaniel Depo., at 29:21-30:7.) Gonsalves and McDaniel never received any information which indicated that Mr. Olango had injured anyone, had threatened anyone, had committed any crime, had entered or attempted to enter any businesses, or was armed with any kind of weapon. (Exhibit 1, Gonsalves Depo., at 44:12-45:2, 57:15-19; Exhibit 2, McDaniel Depo., at 72:3-19, 94:7-12.) Both officers were aware that it was Mr. Olango's sister who had called 911. (Exhibit 1, Gonsalves Depo., at 43:1-9; 102:5-10; Declaration of Steven McDaniel, Dkt. No. 54-5 ["McDaniel Decl."], ¶ 4.)

### *The Events Preceding the Fatal Shooting of Alfred Olango*

After the call regarding Mr. Olango was put out over the radio, Officers Gonsalves and McDaniel went to the Arco gas station at the corner of Broadway and Mollison. (Gonsalves Decl., ¶ 4; McDaniel Decl., ¶ 5.) While the officers were at the Arco, Mr. Olango's sister, Lucy Olango (hereinafter sometimes referred to as "Lucy"), approached them. (Gonsalves Decl., ¶ 5; McDaniel Decl., ¶ 5.) Gonsalves claims he stayed in his vehicle and did not speak to Lucy while she was at the Arco. (Exhibit 1, Gonsalves Depo., at 45:3-6; Gonsalves Decl., ¶ 5.) Lucy testified that she did speak to Gonsalves at the Arco. (Exhibit 3 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Lucy Olango ["Olango Depo."], at 125:8-12, 129:14-24.) Lucy told Gonsalves that Mr. Olango was "having a difficult time" and "felt like somebody was

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

following him." (Exhibit 3, Olango Depo., at 129:25-130:2.) Lucy also told Gonsalves that Mr. Olango had been crossing the street, was not doing well, and needed help. (Exhibit 3, Olango Depo., at 130:2-5.) Gonsalves asked Lucy if Mr. Olango had a gun or any other weapons, and Lucy said that he did not. (Exhibit 3, Olango Depo., at 130:6-10.) At some point, Lucy indicated that she had last seen Mr. Olango near the southwest corner of Broadway and Mollison. (Exhibit 2, McDaniel Depo., at 44:13-15; Exhibit 1, Gonsalves Depo., at 78:25-79:9.)

Officer Gonsalves told Officer McDaniel that he was going to go look for Mr Olango, and left the Arco. (Exhibit 2, McDaniel Depo., at 46:15-18; Exhibit 1, Gonsalves Depo., at 45:7-13; McDaniel Decl., ¶ 5; Gonsalves Decl., ¶ 6.) This was the extent of the tactical plan that Gonsalves and McDaniel formulated before they made contact with Mr. Olango. (Exhibit 1, Gonsalves Depo., at 45:7-46:3; Exhibit 2, McDaniel Depo., at 49:24-50:2, 51:24-52:12.) Gonsalves had OC spray on his person and a baton and a beanbag shotgun in his vehicle, but did not have a Taser. (Exhibit 1, Gonsalves Depo., at 88:15-89:11.) McDaniel had a Taser. (McDaniel Decl., ¶ 7.) The officers did not discuss the deployment of any less lethal force options at any time. (Exhibit 1, Gonsalves Depo., at 45:17-46:3.)

Lucy stayed at the Arco and talked to Officer McDaniel after Officer Gonsalves left. (Exhibit 3, Olango Depo., at 125:13-25, 126:6-8, 130:23-25.) Lucy told McDaniel that Mr. Olango was "in distress." (Exhibit 3, Olango Depo., at 126:11-127:1.) Lucy also told McDaniel that Mr. Olango thought that someone was watching him, or that people were after him. (Exhibit 3, Olango Depo., at 128:16-19.) Lucy did not tell McDaniel that Mr. Olango was trying to get hit by cars, had injured anyone, or had any weapons, and did not give McDaniel any information which suggested that Mr. Olango was a danger to others. (Exhibit 2, McDaniel Depo., at 38:9-10, 41:21-25, 42:3-8.) McDaniel believed that Mr. Olango might be schizophrenic. (McDaniel Decl., ¶ 5.)

///

///

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Officer Gonsalves' Version of Events Surrounding the Shooting*

Mr. Olango was walking in the parking lot of a strip mall near the Los Panchos taco shop when Officer Gonsalves first saw him. (Gonsalves Decl., ¶ 7.) Mr. Olango was not committing any crimes when Gonsalves first saw him, and Gonsalves was not contacting him for the purpose of arresting him for the commission of a crime. (Exhibit 1, Gonsalves Depo., at 55:12-13, 57:20-22.) Gonsalves broadcast that he had located Mr. Olango at approximately 2:10:19 p.m. (Exhibit A to Gonsalves Decl., Dispatch Recordings.) Gonsalves got out of his vehicle and told Mr. Olango that he needed to talk to him. (Gonsalves Decl., ¶ 7.) Mr. Olango stopped about fifteen to twenty feet away from Gonsalves. (Gonsalves Decl., ¶ 7.) Gonsalves claims he saw a "bulge" in Mr.Olango's right front pocket after he exited his vehicle. (Gonsalves Decl., ¶ 8.) Gonsalves also claims that Mr. Olango put his right hand into his right pocket after he noticed this "bulge." (Gonsalves Decl., ¶ 8.)

Officer Gonsalves told Mr. Olango to take his hand out of his pocket. (Gonsalves Decl., ¶ 9.) Mr. Olango did not remove his hand from his pocket or say anything in response to this command. (Gonsalves Decl., ¶ 9.) Gonsalves repeated his command for Mr. Olango to remove his hand from his pocket in an increasingly louder and sterner voice, and motioned as if he was taking his own hand out of his pocket several times. (Gonsalves Decl., ¶ 9.) Mr. Olango did not remove his hand from his pocket, and started to back away from Gonsalves. (Gonsalves Decl., ¶ 9.) Gonsalves drew his firearm and followed Mr. Olango as Mr. Olango walked backwards. (Exhibit 1, Gonsalves Depo., at 53:4-9, 60:18-25, 71:5-12.) At the time that Gonsalves drew his firearm, he believed that Mr. Olango may be suffering from a mental illness or going through some kind of mental breakdown. (Exhibit 1, Gonsalves Depo., at 75:8-20.)

Mr. Olango continued to walk backwards "at a normal pace," and also moved sideways at times. (Gonsalves Decl., ¶¶ 10-12.) Officer Gonsalves moved towards Mr. Olango as Mr. Olango backed away from him and "matched" Mr. Olango's movements. (Exhibit 1, Gonsalves Depo., at 71:9-12; Gonsalves Decl., ¶ 12.) Mr. Olango never ran

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1    away from Gonsalves, did not attempt to enter any of the businesses in the area, and did
2    not assault or threaten any civilians in the area at any time. (Exhibit 1, Gonsalves Depo.,
3    at 83:3-84:2.) Gonsalves claims he continued give Mr. Olango commands to remove his
4    hand from his pocket, and that in response to one of these commands, Mr. Olango said
5    the word "no" a single time (Gonsalves Decl., ¶¶ 12, 15; Exhibit 1, Gonsalves Depo., at
6    59:15-19.) Gonsalves heard someone yelling behind him around this time. (Gonsalves
7    Decl., ¶ 15.) Gonsalves looked over his shoulder, saw Lucy Olango behind him, and
8    told her to stay back or get back. (Exhibit 1, Gonsalves Depo., at 85:25-86:6, 87:6-11)
9        Officer Gonsalves claims that after he told Lucy to stay back or get back, Mr.
10   Olango removed his right hand from his pocket, got into a "shooting stance," and
11   pointed an object that had a "metal barrel" "directly" at him. (Gonsalves Decl., ¶ 17.)
12   Gonsalves claims that Mr. Olango was fifteen feet away from him at this time. (Exhibit
13   1, Gonsalves Depo., at 84:20-85:5.) Gonsalves fired four rounds at Mr. Olango in less
14   than a second. (Exhibit 1, Gonsalves Depo., at 13:15-16, 24:5-12.) Gonsalves claims
15   that throughout the time in which he was firing, Mr. Olango had his arms extended out
16   in front of his body in a "shooting stance," and was facing him and pointing an object
17   that he believed was a firearm at his head. (Exhibit 1, Gonsalves Depo., at 26:21-27:12,
18   38:6-12, 89:24-91:9.) Gonsalves also claims that he stopped shooting after he saw Mr.
19   Olango start to the fall to the ground and drop the object he had, and that Mr. Olango
20   did not start to fall to the ground until after he fired his fourth shot. (Exhibit 1,
21   Gonsalves Depo., at 89:12-18, 91:10-13.)

22        ***Officer McDaniel's Version of Events Surrounding the Shooting***
23        When Officer McDaniel saw Mr. Olango for the first time, Mr. Olango was
24   moving backwards and from side to side, and Officer Gonsalves was telling him to get
25   his hand out of his pocket. (Exhibit 2, McDaniel Depo., at 50:18-23, 64:22-65:2,
26   104:12-105:4.) It appeared to McDaniel that Mr. Olango was "nervous," "scared," and
27   looking for "some kind of avenue of escape." (Exhibit 2, McDaniel Depo., at 105:4-10.)
28   McDaniel drove into the parking lot of the Los Panchos taco shop, got out of his

17-cv-89-BAS-NLS

vehicle, and saw Gonsalves pointing his firearm at Mr. Olango. (McDaniel Decl., ¶ 6; Exhibit 2, McDaniel Depo., at 70:17-71:6.) McDaniel claims that Mr. Olango was walking backwards and moving from side to side at this time, and still had his hand in his pocket. (McDaniel Decl., ¶ 7.) McDaniel decided to "close the distance" on Mr. Olango and use a Taser to incapacitate him. (Exhibit 2, McDaniel Depo., at 74:6-14.) McDaniel drew his Taser and moved closer to Mr. Olango. (McDaniel Decl., ¶ 7.)

Officer McDaniel claims he saw Mr. Olango take his right hand out of his pocket, bring his left arm up to support it, and point an object that he believed was a firearm at Officer Gonsalves. (McDaniel Decl., ¶ 7.) McDaniel claims he saw a "cylindrical piece of metal-looking silver" protruding from Mr. Olango's hand. (Exhibit 2, McDaniel Depo., at 77:17-20.) McDaniel was more than fifteen away from Mr. Olango when he allegedly saw the object protruding from Mr. Olango's hand, and testified that he was only able to see one to two inches of the object, and did not know what it was. (Exhibit 2, McDaniel Depo., at 78:21-23, 106:16-107:1.) McDaniel heard gunshots after Mr. Olango took the object out of his pocket. (McDaniel Decl., ¶ 9.) McDaniel continued to move towards Mr. Olango and fired his Taser at Mr. Olango when he got to within ten to twelve feet of him. (Exhibit 2, McDaniel Depo., at 80:14-81:13; McDaniel Decl., ¶ 9.) Mr. Olango's body locked up and fell to the ground after McDaniel fired the Taser. (Exhibit 2, McDaniel Depo., at 82:14-24.) McDaniel did not fire any shots at Mr. Olango during the incident. (Exhibit 2, McDaniel Depo., at 78:24-79:3.)

### *The Testimony of Lucy Olango, Lakenya Lanier, and Leony Ket*

Lucy Olango witnessed the shooting of Mr. Olango. When Lucy got to the parking lot area of the taco shop, she saw Officer Gonsalves pointing his firearm at Mr. Olango. (Exhibit 3, Olango Depo., at 131:11-132:7, 133:6-9.) Lucy walked up behind Gonsalves and said "don't shoot him officer." (Exhibit A to Plaintiffs' Request for Judicial Notice ("RJN"), Declaration of Lucy Olango ["Olango Decl."], ¶ 3.) Lucy also told Gonsalves "he hasn't got anything" or "he hasn't got a gun." (Exhibit A to RJN, Olango Decl., ¶ 3.) At some point during the incident, Lucy saw Mr. Olango take his

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

hand out of his pocket, put his hands together, and point them at Gonsalves. (Exhibit 3, Olango Depo., at 135:14-17.) Lucy testified that she saw something in Mr. Olango's hands when he put them together and pointed them at Gonsalves, but did not know what it was. (Exhibit 3, Olango Depo., at 136:15-20.) Lucy did not think that Mr. Olango had a firearm. (Exhibit 3, Olango Depo., at 135:18-22.)

Lakenya Lanier also witnessed the shooting of Mr. Olango. At her deposition, Ms. Lanier testified that she did not see anything in Mr. Olango's hands right before the shooting happened:

> Q:    So right before the shooting happened, did you see what he had in his hand?
>
> A:    No. . . . Nope. Nope. Not at all.
>
> Q:    Could you see anything at all --
>
> A:    No. . . .
>
> Q:    Could you see anything at all in his hands prior to the time of the shooting?
>
> A:    No.

(Exhibit 4 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Lakenya Lanier ["Lanier Depo."], at 48:8-20.) Ms. Lanier was also asked at her deposition if she saw Mr. Olango "pull some object out of his pocket, or was it just the motion of his hands," and replied that "[i]t was just the motion of his hands . . . that's it." (Exhibit 4, Lanier Depo., at 53:5-9.) Ms. Lanier also testified that Mr. Olango's hands were pointed towards Lucy Olango in the moments preceding the shooting. (Exhibit 4, Lanier Depo, at 20:17-24.) Ms. Lanier saw Officer Gonsalves getting out of his patrol vehicle before the shooting, and testified that Gonsalves "automatically took his gun out" at that time. (Exhibit 4, Lanier Depo., at 22:12-16.)

Leony Ket also witnessed the shooting of Mr. Olango. Ms. Ket claims she saw something with a "circle" at the end in Mr. Olango's hands. (Exhibit 5 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Leony Ket ["Ket Depo."], at 22:2-11.) Ms. Ket testified that she did not see anything protruding or pointing out of Mr.

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

Olango's hands when they were together, and described the object that she saw in Mr.

Olango's hands as being black in color. (Exhibit 5, Ket Depo., at 22:6-11, 49:4-50:4.)

### The Video Recordings Depicting the Shooting

The shooting of Mr. Olango was captured on a surveillance camera recording and a cell phone recording. (*See* Exhibit C to Gonsalves Decl.; Exhibit C to Declaration of Rick Sutherland, Dkt. No. 54-4 ["Sutherland Decl."].) The surveillance camera recording depicts Mr. Olango backing up in the parking lot of the Los Panchos taco shop, and then turning to his right and walking towards the curved portion of the drive-thru lane as Officer Gonsalves comes into view with his firearm in his left hand and follows him. Mr. Olango's right hand appears to be inside his right pocket at this time; his left hand is visible. When Mr. Olango reaches the curved portion of the Los Panchos drive-thru lane, he turns around to face Gonsalves and stops. Gonsalves continues to approach Mr. Olango and then stops.

After Gonsalves stops, Mr. Olango takes several steps to his right. Gonsalves appears to raise his firearm and point it at Mr Olango, and mirrors Mr. Olango's movements by stepping to the left. Mr. Olango then backs up towards the bed of a white pickup truck as Gonsalves moves towards him, stops for a moment, and then takes several more steps to his right as McDaniel's patrol vehicle comes into view. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the left. When Mr. Olango reaches the area in front of the rear door on the driver's side of the pickup truck, he spins around and takes a couple of steps to his left as McDaniel gets out of his vehicle. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the right.

The rest of the incident was captured on the surveillance camera recording and the cell phone recording. These recordings depict Mr. Olango backing up towards the pickup truck as Gonsalves stops. A woman can be heard saying "officer don't shoot him" on the cell phone recording. Mr. Olango looks to his left and takes a couple of steps to his left. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl. Suite 1010
(323)435-8205

right. A woman screams something to the effect of "take your hands out your pockets," and Mr. Olango turns, appears to look in the direction of the woman's voice, and then takes a couple of steps to his right. Gonsalves continues to mirrors Mr. Olango's sideways movements by stepping to the left.

Mr. Olango stops after he takes a couple of steps to his right and a male voice says "take your hand out of your pocket." Mr. Olango extends his right arm and hand out to the right side of his body. It is unclear whether Mr. Olango has anything in his right hand when he removes it from his pocket and extends it out to his side. While Mr. Olango is extending his right arm and hand out to his side, a male voice says "you need to back up." Mr. Olango's right arm and hand disappear from view, and a male voice says "shut the fuck up." Mr. Olango then steps to his right, extends his left arm and hand out in front of his body, and points his left arm and hand at Lucy Olango as Gonsalves mirrors his movements by stepping to the left. Mr. Olango then lowers his left arm and hand as Gonsalves steps in front of him and McDaniel walks towards him with his arms outstretched in front of his body. Mr. Olango raises both of his arms, extends them out in front of his body with his hands together, points his hands in Gonsalves' direction, and then falls forward and rotates away from Gonsalves as he goes down to the ground. Four gunshots can be heard on the cell phone recording.

### *The Locations and Trajectories of the Gunshot Wounds that Alfred Olango Sustained*

Mr. Olango sustained four gunshot wounds during the incident. (Exhibit 6 to Plaintiffs' Notice of Lodgment of Exhibits, Autopsy Report, at pp. 1-2, 6-8; Exhibit 7 to Plaintiffs' Notice of Lodgment of Exhibits, Deposition of Brankica Paunovic ["Paunovic Depo."], at 22:14-23.) One of the bullets that Officer Gonsalves fired struck Mr. Olango's right upper arm. (Exhibit 6, Autopsy Report, at pp. 1, 6-7; Exhibit 7, Paunovic Depo., at 39:15-21.) The bullet that entered Mr. Olango's right upper arm traveled from front to back without any discernible left to right or vertical deviation, fractured Mr. Olango's humerus, and was recovered from his arm. Exhibit 6, Autopsy Report, at pp. 1, 6-7; Exhibit 7, Paunovic Depo., at 39:15-21, 41:21-42:5, 43:4-9.) Dr. Brankica Paunovic

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

("Dr. Paunovic"), the medical examiner who performed the autopsy on Mr. Olango, testified that she believes, based on her review of one of the videos depicting the shooting of Mr. Olango and the autopsy that she performed, that the first shot Gonsalves fired struck Mr. Olango's right upper arm and caused his body to spin to the right and go down. (Exhibit 7, Paunovic Depo., at 45:21-47:4, 47:21-48:1, 81:10-83:10, 93:14-19.)

Another one of the bullets that Officer Gonsalves fired struck Mr. Olango's left chest. (Exhibit 6, Autopsy Report, at pp. 1, 7; Exhibit 7, Paunovic Depo., at 48:2-6.) The bullet that entered Mr. Olango's left chest traveled from front to back, left to right, and downward, and was recovered from his right lower back. (Exhibit 6, Autopsy Report, at pp. 1-2, 7-8; Exhibit 7, Paunovic Depo., at 57:1-21.) Dr. Paunovic testified that she believes that the second shot Gonsalves fired struck Mr. Olango's left chest, and that Mr. Olango was already moving downward and rotating when he was shot in the chest. (Exhibit 7, Paunovic Depo., at 59:23-61:20, 62:3-5, 62:20-63:14; 81:10-83:12.) Dr. Paunovic also testified that the gunshot wound to Mr. Olango's left chest would have caused his body to drop involuntarily. (Exhibit 7, Paunovic Depo., at 62:17-19.)

The other two bullets that Officer Gonsalves fired struck the left side of Mr. Olango's neck and the back of Mr. Olango's left shoulder. (Exhibit 6, Autopsy Report, at pp. 1-2, 6, 8; Exhibit 7, Paunovic Depo., at 23:14-23, 25:7-23, 67:10-13.) The bullet that entered the left side of Mr. Olango's neck traveled from back to front, left to right, and downward, and exited out of the front of his neck. (Exhibit 6, Autopsy Report, at pp. 1, 6; Exhibit 7, Paunovic Depo., at 26:16-19, 27:3-6.) The bullet that entered the back of Mr. Olango's left shoulder traveled from left to right and downward as it moved towards the front of his body, and then came to rest in his thoracic cavity. (Exhibit 6, Autopsy Report, at pp. 2, 8; Exhibit 7, Paunovic Depo., at 69:24-71:25.) Mr. Olango also sustained a graze wound on the back of his right hand. (Exhibit 6, Autopsy Report, at pp. 2, 8; Exhibit 7, Paunovic Depo., at 72:25-73:7.) Dr. Paunovic believes that it is likely that this graze wound was caused by the bullet that passed through Mr. Olango's neck. (Exhibit 6, Autopsy Report, at pp. 3, 8; Exhibit 7, Paunovic Depo., at 75:18-23.)

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

Dr. Paunovic believes that the last two shots Officer Gonsalves fired struck the back of Mr. Olango's shoulder and the left side of Mr. Olango's neck. (Exhibit 7, Paunovic Depo., at 67:10-25, 75:18-23, 81:10-83:16.) Dr. Paunovic testified that Mr. Olango "had to have been in some kind of rotation to get that kind of shot" to the left side of his neck. (Exhibit 7, Paunovic Depo., at 31:5-11.) Dr. Paunovic also testified that Mr. Olango's body had to be lower than the muzzle of Gonsalves' firearm for the bullet that entered Mr. Olango's neck to have traveled through his neck at the angle it did, and agreed that the downward angle of the shot to Mr. Olango's neck was "pretty steep." (Exhibit 7, Paunovic Depo., at 28:1-29:9.) Dr. Paunovic believes that it is probable that Mr. Olango's back or left side was facing Gonsalves when Gonsalves fired the shot that entered his neck, and testified that he could have been turned away from Gonsalves when Gonsalves fired that shot. (Exhibit 7, Paunovic Depo., at 31:12-32:13.) Dr. Paunovic also testified that the downward angles of the gunshot wounds to Mr. Olango's chest, neck, and shoulder are consistent with Mr. Olango's body dropping to the ground at the time that he sustained those wounds. (Exhibit 7, Paunovic Depo., at 99:14-100:1.)

### The Vaping Device Recovered at the Scene of the Shooting and the Bullet Impact on the Front Bumper of the Pickup Truck

Investigators recovered a vaping device at the scene of the shooting. (Exhibit 8, Laboratory Report; Exhibit 9 to Plaintiffs' Notice of Lodgment of Exhibits, Scene Photos.) The vape had a rectangular body which measured approximately 4 x 2 1/4 x 1 inches. (Exhibit 8, Laboratory Report, at p. 2; Exhibit 10 to Plaintiffs' Notice of Lodgment of Exhibits, Photos of Vape.) The vape also had a barrel and mouthpiece which extended from the body, tapered at the end, and measured approximately 3 x 1 inches. (Exhibit 8, Laboratory Report, at p. 2; Exhibit 10, Photos of Vape.) The barrel and mouthpiece of the vape were silver in color, and part of the barrel was encased in clear glass. (Exhibit 8, Laboratory Report, at p. 2; Exhibit 10, Photos of Vape.) Investigators also observed a defect which was consistent with a bullet hole on the front, driver's side bumper of the white pickup truck that Mr. Olango was next to at the time of

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1 the shooting. (Exhibit 8, Laboratory Report, at p. 2; Exhibit 11 to Plaintiffs' Notice of

2 Lodgment of Exhibits, Photographs of Truck and Expended Round.) An expended bullet

3 was found underneath the truck, near the front passenger side tire. (Exhibit 8, Laboratory

4 Report, at p. 2; Exhibit 11, Photographs of Pickup Truck and Expended Round.)

5 ***The Officers' Training Regarding the Use of Deadly Force and Field Contacts with***

6 ***Mentally Unstable Subjects***

7     Officers are trained that deadly force should be used only when other means of

8 control are unreasonable or have been exhausted. (Exhibit 1, Gonsalves Depo., at 24:21-

9 25:7; Exhibit 2, McDaniel Depo., at 15:18-16:18.) Officers are also trained that they are

10 no longer authorized to use deadly force after a threat ceases to exist. (Exhibit 1,

11 Gonsalves Depo., at 12:18-22, 18:2-4.) Officers are also trained to utilize cover,

12 concealment, and distance during encounters with persons who are armed or may be

13 armed with a firearm or other weapon. (Exhibit 1, Gonsalves Depo., at 48:5-25, Exhibit

14 2, McDaniel Depo., at 107:22-108:11.)

15     The tactics and methods that officers are taught in dealing with a person who may

16 be mentally ill include calming the situation, which involves taking time to assess the

17 situation, providing reassurance that officers are there to help, giving the person time to

18 calm down, moving slowly, assuming a quiet, nonthreatening manner when approaching

19 and conversing with the person, and avoiding physical contact if no violence or

20 destructive acts have taken place. (Exhibit 12 to Plaintiffs' Notice of Lodgment of

21 Exhibits, Rule 26 Report of Roger Clark ["Clark Rule 26 Report"], at p. 24; Exhibit 2,

22 McDaniel Depo., at 18:2-19:16, 20:1-11.) Officers are also trained to not threaten the

23 person with arrest or in any other manner since threats can create additional fright, stress,

24 or potential aggression. (Exhibit 12, Clark Rule 26 Report, at p. 24.) Roger Clark,

25 Plaintiffs' police practices expert, has opined that Officers Gonsalves and McDaniel did

26 not use trained and expected tactics and methods during the incident involving Mr.

27 Olango. (Exhibit 12, Clark Rule 26 Report, at p. 22.) These tactical deficiencies are

28 discussed in detail in Mr. Clark's Rule 26 Report. (Exhibit 23, Clark Rule 26 Report, at

17-cv-89-BAS-NLS

1  pp. 22-32.) The El Cajon Police Department also has a Psychiatric Emergency Response

2  Team (PERT) which consists of a clinician who rides with an officer and conducts

3  evaluations of persons who are experiencing a mental health crisis. (Exhibit 2, McDaniel

4  Depo., at 95:11-20, 95:25-96:9) The PERT Team was not requested during the incident

5  involving Mr. Olango. (Exhibit 2, McDaniel Depo., at 100:1-3, 105:21-22.)

6  **ARGUMENT**

7  **I.    STANDARD OF REVIEW**

**THE COCHRAN FIRM CALIFORNIA**
4929 Wilshire Bl.
Suite 1010
(323)435-8205

8          Summary judgment is only appropriate if the moving party shows that the material

9  facts are undisputed, and the moving party is entitled to judgment as a matter of law.

10  Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine

11  disputes of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In

12  determining whether genuine issues of material fact remain, [the Court is] required to

13  view all evidence and draw all inferences 'in the light most favorable to the nonmoving

14  party.'" *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013). If the

15  nonmoving party's evidence conflicts with the moving party's evidence, the court "must

16  assume the truth of the evidence set forth by the nonmoving party." *Leslie v. Grupo ICA*,

17  198 F.3d 1152, 1158 (9th Cir. 1999). "[I]f reasonable jurors, drawing all inferences in

18  favor of the nonmoving party, could return a verdict in the nonmoving party's favor,"

19  summary judgment should not be granted. *Hayes v. County of San Diego*, 736 F.3d 1223,

20  1228 (9th Cir. 2013).

21          In determining whether to grant summary judgment in a deadly force case, the

22  court must carefully examine all of the evidence in the record, including medical reports,

23  contemporaneous statements by the officers, the available physical evidence, and any

24  expert testimony that is proffered by the plaintiff, and must also evaluate the officers'

25  testimony for internal inconsistencies and inconsistencies with other known facts. *See*

26  *George v. Morris*, 724 F.3d 1191, 1196 (9th Cir. 2013); *Scott v. Henrich*, 39 F.3d 912,

27  915 (9th Cir. 1994). The court "cannot simply accept what may be a self-serving account

28  by the police officer." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014). It

"must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Scott*, 39 F.3d at 915.

With regard to the appropriateness of excessive force cases being decided as a matter of law, the Ninth Circuit has "repeatedly said" that the question of "whether the force used to effect an arrest is reasonable 'is ordinarily a question of fact for the jury.'" *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2001). Excessive force cases are "rarely" decided as a matter of law because "the Fourth Amendment test for reasonableness is inherently fact-specific." *Id.* Since the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," and excessive force cases "almost always turn on a jury's credibility determinations," summary judgment should be granted "sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

## II.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR VIOLATIONS OF ALFRED OLANGO'S FOURTH AMENDMENT RIGHTS

### A.    When Officer Gonsalves Shot Mr. Olango, He Violated Mr. Olango's Fourth Amendment Right to Be Free from Unreasonable Seizures

The Fourth Amendment to the United States Constitution prohibits the use of excessive force by police in the course of apprehending suspected criminals. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). An officer's use of force is only constitutional if it is objectively reasonable in light of the facts and circumstances confronting him. *Id.* at 397. Deadly force may not be used unless the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The reasonableness inquiry in an excessive force case takes the totality of the circumstances into account, and "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Glenn*

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*v. Washington County*, 673 F.3d 864, 871-72 (9th Cir. 2011). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Nor is "a simple statement by an officer that he fears for his safety or the safety of others . . . enough; there must be objective factors to justify such a concern." *Id.*

In determining whether the governmental interests at stake justified the type and amount of force used, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Another relevant factor is the "availability of less intrusive alternatives to the force employed." *Glenn*, 673 F.3d at 872. "[P]olice are required to consider [w]hat other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding [the] use of force reasonable." *Id.* at 876. The court should also consider "whether proper warnings were given." *Id.* at 872. "A]ppropriate warnings comport with actual police practice and . . . should be given, when feasible, if the use of force may result in serious injury." *Id.*

In appropriate cases, the court should also consider "whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* at 872. An officer's tactical conduct during an incident involving a mentally ill or emotionally disturbed individual is relevant to the issue of whether the officer's use of force was objectively reasonable:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. . . . In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Even when an

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Deorle*, 272 F.3d at 1282-83 (internal citations omitted)

The disputed and undisputed facts in this case demonstrate that Officer Gonsalves used excessive force when he shot Mr. Olango. When viewed in the light most favorable to Plaintiffs, the evidence in this case establishes the following:

a.    Mr. Olango was not armed with a firearm or any other kind of weapon when he was shot;

b.    Gonsalves fired multiple shots at Mr. Olango during the incident;

c.    The first shot that Gonsalves fired caused Mr. Olango's body to spin to the right, away from Gonsalves, and go down;

d.    Gonsalves' second shot struck Mr. Olango's left chest as Mr. Olango's body was moving downward and rotating;

e.    The last two shots that Gonsalves fired struck the left side of Mr. Olango's neck and the back of Mr. Olango's left shoulder, and traveled from left to right, and downward as they moved from the back of his body to the front of it;

f.    The medical examiner testified that it is probable that Mr. Olango's back or left side was facing Gonsalves when Gonsalves fired the shot that struck his neck;

g.    The downward angles of the gunshot wounds to Mr. Olango's chest, neck, and shoulder are consistent with Mr. Olango falling down to the ground and rotating away from Gonsalves while he was being shot;

h.    The location of the bullet impact to the pickup truck that Mr. Olango was next to at the time of the shooting indicates that Gonsalves was firing his weapon at Mr. Olango at a time when the front of Mr. Olango's neck was low enough for the bullet that exited it to impact the front bumper of the pickup truck.

i.    The locations and trajectories of the gunshot wounds to Mr. Olango's chest, neck, and shoulder are inconsistent with Gonsalves' testimony regarding Mr. Olango's

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

positioning at the time of the shooting;

j.      Lakenya Lanier testified that she did not see anything in Mr. Olango's hands right before the shooting happened, and did not see Mr. Olango pull any objects out of his pocket;

k.      Ms. Lanier also testified that Mr. Olango was pointing his hands at Lucy Olango right before Gonsalves started to fire his weapon;

l.      Lucy Olango did not know what was in Mr. Olango's hands at the time of the shooting, but did not think that it was a firearm;

m.      Leony Ket did not see anything protruding or pointing out of Mr. Olango's hands when they were together;

n.      The only thing that Ms. Ket allegedly saw in Mr. Olango's hands at the time of the shooting was something that had a "circle" at the end of it, and appeared to be black in color;

o.      The video recordings of the shooting show Mr. Olango removing his right hand from his pocket and extending it out to his right side after a male voice tells him to take his hand out of his pocket;

p.      The mouthpiece of the vaping device has a smaller diameter than the barrel, and in some of the photographs that were taken of the vape, the part of the barrel that the mouthpiece is connected to is not aligned with the rest of the barrel;

q.      Gonsalves was responding to a "5150" call regarding an unarmed, mentally unstable individual who had been seen walking into traffic;

r.      The details of the "5150" call that appeared on the computer in Gonsalves' patrol vehicle stated that Mr. Olango did not have any weapons;

s.      Lucy Olango told Gonsalves that Mr. Olango did not have a firearm or any other weapons when she spoke to him at the Arco;

t.      Lucy also told Gonsalves that Mr. Olango did not have anything or did not have a gun when she got to the parking lot of the taco shop;

///

17-cv-89-BAS-NLS

1   u.    Gonsalves never received any information which indicated that Mr. Olango

2   was armed with or had access to any kind of weapon;

3   v.    Gonsalves never received any information which indicated that Mr. Olango

4   had injured anyone or threatened anyone in any way;

5   w.    Gonsalves never received any information which indicated that Mr. Olango

6   had entered or attempted to enter any businesses in the area;

7   x.    Gonsalves never received any information which indicated that Mr. Olango

8   had committed a crime;

9   y.    Mr. Olango was not committing any crimes when Gonsalves first saw him;

10  z.    Gonsalves was not contacting Mr. Olango for the purpose of arresting him

11  for the commission of a crime;

12  aa.   Gonsalves never saw Mr. Olango assault or threaten any of the civilians or

13  enter any of the businesses in the area at any time;

14  bb.    Gonsalves did not formulate any sort of tactical plan for the situation he

15  was responding to, did not take time to assess the situation or give Mr. Olango sufficient

16  time to calm down, and pursued Mr. Olango on foot without waiting for backup or

17  utilizing any form of cover;

18  cc.   Gonsalves unnecessarily elevated and escalated the stress of the situation by

19  moving closer to Mr. Olango, mirroring his movements, pointing his firearm at him, and

20  giving him repeated commands in an increasingly louder and sterner voice;

21  dd.   Gonsalves did not use the OC spray he was carrying, did not attempt to

22  retrieve his beanbag shotgun or baton from his vehicle, made no effort to get a beanbag

23  shotgun to the scene, and never requested a PERT deployment;

24  ee.   Gonsalves did not warn Mr. Olango that he was going to fire his weapon;

25  ff.   The entire incident was over in approximately one and half minutes;

26  gg.   Mr. Olango never verbally threatened Gonsalves or any other person;

27  hh.   Mr. Olango never ran away from Gonsalves at any time;

28  ii.   McDaniel did not fire any shots at Mr. Olango.

The
Cochran
Firm
California
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

**B.      The Testimony of the Medical Examiner Demonstrates That Mr. Olango Could Not Have Been Positioned in the Threatening Manner That Officer Gonsalves Describes Throughout the Time in Which Officer Gonsalves Was Firing**

The most important factor in determining whether Officer Gonsalves used excessive force is the immediacy of the threat that Mr. Olango posed. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014). There are material factual disputes in this case concerning Mr. Olango's positioning at the time of the shooting. Gonsalves claims that throughout the time in which he was firing, Mr. Olango had his arms extended out in front of his body in a "shooting stance," and was facing him and pointing an object that he believed was a firearm at his head. This claim is contradicted by the locations and trajectories of the gunshot wounds that Mr. Olango sustained. One of the bullets that Gonsalves fired entered the back of Mr. Olango's left shoulder, traveled from left to right and downward as it moved towards the front of his body, and then came to rest in his thoracic cavity. A reasonable jury could find from the location of the gunshot wound to Mr. Olango's left shoulder, and the manner in which the bullet associated with that wound traveled through his body, that Mr. Olango was not facing Gonsalves in a "shooting stance" when Gonsalves fired the shot that struck his shoulder.

Another one of the bullets that Officer Gonsalves fired entered the left side of Mr. Olango's neck, traveled from back to front, left to right, and downward, and then exited out of the front of his neck. The medical examiner testified that Mr. Olango's body had to have been in some kind of rotation to get that kind of shot to the left side of his neck, and had to have been lower than the muzzle of Gonsalves' firearm for the bullet to have traveled downward at the angle that it did. The medical examiner also testified that it is probable that Mr. Olango's back or left side was facing Gonsalves when Gonsalves fired the shot that struck the side of Mr. Olango's neck, and that Mr. Olango could have been turned away from Gonsalves when Gonsalves fired that shot.

///

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

The angles of the gunshot wounds to Mr. Olango's chest, neck, and shoulder also contradict Officer Gonsalves' account of Mr. Olango's positioning during the shooting. The bullets that struck the left side of Mr. Olango's neck, the back of his left shoulder, and the left side of his chest traveled from left to right and downward as they passed through his body. The medical examiner testified that Mr. Olango's body was moving downward and rotating when he was shot in the chest.  The medical examiner also testified that the downward angles of the gunshot wounds to Mr. Olango's chest, neck, and shoulder are consistent with Mr. Olango falling down to the ground and rotating away from Gonsalves while he was being shot.

The location of the bullet impact on the pickup truck that Mr. Olango was next to at the time of the shooting also indicates that Mr. Olango was falling to the ground as he was being shot. A defect which was consistent with a bullet hole was located on the front, driver's side bumper of the truck, and an expended round was found underneath the truck. Three of the four bullets that Officer Gonsalves fired entered Mr. Olango's arm, neck, and shoulder, and were recovered from inside his body. The other bullet that Gonsalves fired entered and exited out of Mr. Olango's neck. Since Gonsalves fired a total of four rounds, and three of those rounds were recovered from inside Mr. Olango's body, the round that passed through Mr. Olango's neck had to have been the round that perforated the bumper of the truck. This indicates that Gonsalves was firing his weapon at Mr. Olango at a time when the front of Mr. Olango's neck was low enough for the bullet that exited it to impact the front bumper of the pickup truck.

An analysis of the gunshot wounds that Mr. Olango sustained demonstrates that Mr. Olango could not have been facing Officer Gonsalves in a "shooting stance" and pointing an object at Gonsalves during the entirety of the time that Gonsalves was firing his weapon. The locations and trajectories of those wounds, and the location of the bullet impact on the pickup truck that Mr. Olango was next to when he was shot, show that Mr. Olango was falling to the ground and rotating away from Gonsalves while he was being shot. A jury could find from this physical evidence that Mr. Olango did not pose an

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

immediate threat of death or serious bodily injury to Gonsalves at the time of the shooting.

**C.    There Are Material Factual Disputes Concerning the Reasonableness of Officer Gonsalves' Belief That Mr. Olango Had a Firearm in His Hands**

There are also material factual disputes concerning the reasonableness of Officer Gonsalves' belief that the object he claims he perceived in Mr. Olango's hands was a firearm. Lucy Olango testified that she told Gonsalves on two separate occasions that Mr. Olango did not have a firearm or any other weapons. The call details included an entry which stated "no weapons." Gonsalves never received any information which indicated that Mr. Olango was in possession of or had access to a firearm or any other weapons, or had threatened any person with a weapon at any time. Lucy Olango did not think that Mr. Olango had a firearm in his hands when he was pointing them towards Gonsalves. Leony Ket claims she saw something in Mr. Olango's hands that was circular at the end, but did not see anything protruding or pointing out of his hands. Ms. Ket also stated that the circular shape she saw in Mr. Olango's hands was black; the barrel and mouthpiece of the vaping device that was recovered at the scene of the shooting are silver. Lakenya Lanier testified that she did not see anything in Mr. Olango's hands right before the shooting happened, and did not see Mr. Olango pull any objects out of his pocket. The configuration of the barrel and mouthpiece of the vape is also different than the configuration of the barrel of a gun. Gun barrels do not taper. They are the same diameter from one end to the other. The mouthpiece at the end of the barrel of the vape is smaller in diameter than the barrel, and in some of the photographs of the vape, the part of the barrel that the mouthpiece is connected to is not aligned with the rest of the barrel. A jury could find from all of this evidence that Gonsalves did not reasonably believe that Mr. Olango was holding a firearm.

///

///

///

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

**The
COCHRAN
FIRM
CALIFORNIA**
4929 Wilshire Bl.
Suite 1010
(323)435-8205

**D.     All Other Relevant Factors Weigh in Favor of a Finding That Officer Gonsalves Used Excessive Force Against Mr. Olango**

In determining whether Officer Gonsalves used excessive force, the court must also consider the severity of the crime at issue, and whether Mr. Olango was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. These factors clearly weigh in favor of Plaintiffs. Gonsalves never received any information which indicated that Mr. Olango had committed a crime. Mr. Olango was not committing any crimes when Gonsalves first saw him, and Gonsalves was not contacting him for the purpose of arresting him for the commission of a crime. Mr. Olango never ran away from Gonsalves at any time. As for Mr. Olango's failure to comply with Gonsalves' commands, the Ninth Circuit has held that the failure to comply with commands that is a minor offense which will not support the use of a significant level of force to effect the arrest of a nonviolent suspect who does not pose an immediate threat. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

Officer Gonsalves' tactical response to the situation is also highly relevant to the reasonableness inquiry in this case. Gonsalves was responding to a "5150" call regarding an unarmed, mentally unstable individual who had not committed any crimes. Gonsalves did not formulate any sort of tactical plan for the situation he was responding to, did not take time to assess the situation or give Mr. Olango sufficient time to calm down, pursued Mr. Olango on foot without waiting for Officer McDaniel or any other form of backup, did not use the OC spray he was carrying, did not attempt to retrieve his beanbag shotgun or baton from his vehicle, made no effort to get a beanbag shotgun to the scene, and never requested a PERT deployment. Gonsalves also unnecessarily elevated and escalated the stress of the situation by moving closer to Mr. Olango, mirroring his movements, pointing his firearm at him, and giving him repeated commands in an increasingly louder and sterner voice. Gonsalves did not tell Mr. Olango why he was contacting him, or reassure Mr. Olango that he was there to help, or attempt to open any sort of dialogue with Mr. Olango. All Gonsalves did was repeatedly order Mr. Olango to

17-cv-89-BAS-NLS

remove his hand from his pocket. Gonsalves also failed to give Mr. Olango any warning that he was going to fire his weapon. The deficiencies in Gonsalves' tactical response to the situation involving Mr. Olango provide further support for a finding that Gonsalves used objectively unreasonable force in this case.

**E.    The Fourth Amendment Does Not Allow an Officer to Use Deadly Force Against an Individual Who is Armed with a Weapon But is Not Facing the Officers, is Turning Away from The Officers, or is in the Process of Falling to the Ground When the Officer Fires His Weapon**

The Ninth Circuit has consistently held that if a suspect is armed with a weapon but is not threatening the officers or others with it, the Fourth Amendment does not permit the officers to use deadly force against the suspect. *See George*, 724 F.3d at 1199-1200; *Glenn*, 673 F.3d at 879-80; *Harris v. Roderick*, 126 F.3d 1189, 1202-03 (9th Cir. 1997); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

The Ninth Circuit's decision in *Curnow* demonstrates that Officer Gonsalves is not entitled to summary judgment on Plaintiffs' Fourth Amendment claim. In *Curnow*, the officers shot Curnow, who was armed with a firearm and had been seen "slapping and shaking" a woman and "pleading with her to wake up," once while he was inside his home, and then shot him a second time after he ran out of the house. *See* 952 F.2d at 323. The officers claimed that they shot Curnow the first time after he raised the firearm that he had as they entered his home, and then shot him a second time after he ran out of the house with the firearm and then allegedly turned and pointed it at one of the officers. *Id.* The plaintiffs submitted evidence which showed that the officers shot Curnow in the back, and was not pointing the firearm at the officers at that time. *See id.* The Ninth Circuit held that the officers could not have reasonably believed that their use of deadly force was lawful because Curnow was not facing the officers or pointing the gun at them when they fired. *Id.* at 325.

The Northern District of California's in *Chien Van Bui v. City & County of San Francisco*, 61 F. Supp. 3d 877, 886-87 (N.D. Cal. 2014), *reversed in part on other*

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*grounds by Bui v. City & County of San Francisco*, 699 Fed. App'x 614 (9th Cir. 2017), also demonstrates that Officer Gonsalves is not entitled to summary judgment on Plaintiffs' Fourth Amendment claim. The officers in *Bui* responded to a call regarding Vinh Van Bui, who had reportedly stabbed a young woman in the back with an X-Acto knife inside the house they shared with several other family members and was "mentally challenged." *See* 61 F. Supp. 3d at 884-86. When the officers arrived at the house, Bui, emerged from the bathroom with the X-Acto knife in his hand. *Id.* at 886. The officers ordered Bui to drop the knife at gunpoint. *Id.* at 886-87. Bui did not drop the knife and started to advance towards the officers. *Id.* at 887.

The officers claimed that Bui was holding and waving the knife in an aggressive and menacing manner as he moved towards them, and got close enough to stab them if he lunged in their direction. *Id.* at 888-89. The plaintiffs presented evidence regarding the angles of the gunshot wounds that Bui sustained which indicated that Bui was turning away from the officers as they shot him, and was falling as a result of being shot or cringing and trying to avoid being shot. *Id.* at 888. The district court denied summary judgment because there were genuine issues of material fact which precluded a finding that the officers' use of deadly force was objectively reasonable. *See id.* at 891. In denying summary judgment, the district court noted that the plaintiffs had presented evidence which indicated that Bui was in the process of turning away from the officers when he was shot. *Id.* at 894-95.

## F.    The Cases Defendants Rely On Are Factually Distinguishable

In asserting that they are entitled to summary judgment in this case, Defendants point the Court to a number of cases which they contend are controlling on the issue of the objective reasonableness of Officer Gonsalves' use of force. *See* Motion at pp. 21-24 (citing *Corrales v. Impastato*, 650 F. App'x 540 (9th Cir. 2016); *Barnes v. City of Pasadena*, 508 F. App'x 663 (9th Cir. 2013); *Nehad v. Zimmerman*, 2017 U.S. Dist. LEXIS 208537 (S.D. Cal. Dec. 18, 2017); *Elvira v. City of Escondido*, 2016 U.S. Dist. LEXIS 136215, (S.D. Cal. Sept. 30, 2016); *Bowles v. City of Porterville*, 2012 U.S. Dist.

17-cv-89-BAS-NLS

LEXIS 71996 (E.D. Cal. May 23, 2012); *Arian v. City of Los Angeles*, 2013 U.S. Dist. LEXIS 192420 (C.D. Cal. April 30, 2013); *Hammett v. Paulding County*, 875 F.3d 1036 (11th Cir. 2017); *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015); *Simmonds v. Genesee County*, 682 F.3d 438 (6th Cir. 2012); *Lamont v. New Jersey*, 673 F.3d 177, (3d Cir. 2011);[2] *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991); *Hudspeth v. City of Shreveport*, 2006 U.S. Dist. LEXIS 91053 (W.D. La. Dec. 18, 2006); *Hill v. Witt*, 2010 U.S. Dist. LEXIS 74655 (N.D. Okla. July 22, 2010); *Little v. Smith*, 114 F. Supp. 2d 437 (W.D.N.C. 2000)). Many of the material facts in the cases Defendants cite are clearly distinguishable from the facts at issue in this case.

*Corrales*, *Bowles*, *Nehad*, *Arian*, *Hammett*, *Pollard*, *Simmonds*, *Lamont*, *Slattery*, *Hudspeth*, *Hill*, and *Little* all involved shootings of individuals who had committed a crime or were engaged in some form of criminal activity. *See Corrales*, 650 F. App'x at 541 (officer confronted suspect during an undercover drug deal); *Bowles*, 2012 U.S. Dist. LEXIS 71996, at *2-3, 20-21 (officers observed suspect attempting to break into cars in several parking lots that had a history of car theft); *Nehad*, 2017 U.S. Dist. LEXIS 208537, at *3, 13-14 (officers were advised that the suspect was threatening people with a knife); *Arian*, 2013 U.S. Dist. LEXIS 192420, at *2-3 (suspect ran a red light and then led officers on a high-speed vehicle pursuit); *Hammett*, 875 F.3d at1038 (officers were executing a search warrant for evidence of drug activity); *Pollard*, 780 F.3d at 399 (suspect was alleged to have committed several rapes, and had a warrant for his arrest on charges of forcible rape, assault with a deadly weapon, burglary, and kidnapping);

---

[2] *Lamont* actually supports a denial of summary judgment in this case. In *Lamont*, the Third Circuit held that the officers' initial shots were objectively reasonable, but found a triable issue of fact regarding the reasonableness of the officers' continued use of force because more than half of the bullets that the officers hit the suspect from behind. *See* 637 F.3d at 183-85.

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1    *Simmonds*, 682 F.3d at 440 (suspect threatened to kill his ex-girlfriend's parents);

2    *Lamont*, 673 F.3d at 179-180 (suspect was driving a stolen vehicle); *Slattery*, 939 F.2d at

3    213-14 (suspect was at a location that was the subject of a narcotics sting operation, and

4    the driver of the vehicle the suspect was in approached an officer who was posing as a

5    narcotics dealer); *Hudspeth*, 2006 U.S. Dist. LEXIS 91053, at *2-3 (officer observed the

6    suspect run a red light and believed that the suspect was driving while intoxicated); *Hill*,

7    2010 U.S. Dist. LEXIS 74655, at *2-3 (suspect was a gang member who had multiple

8    warrants and was wanted for questioning in connection with two armed robberies);

9    *Little*, 114 F. Supp. 2d at 439 (suspect had threatened his sister and had a warrant out for

10    his arrest).

11      The officers in *Nehad*, *Elvira*, *Pollard*, *Simmonds*, and *Hill* all received

12    information from dispatch or other sources which indicated that the suspects they were

13    confronting were armed or potentially armed. *See Nehad*, 2017 U.S. Dist. LEXIS

14    208537, at *3 (officers were advised that the suspect was threatening people with a

15    knife); *Elvira*, 2016 U.S. Dist. LEXIS 136215, at *6 (officer saw a knife in the suspect's

16    hand and broadcast that the suspect had a knife); *Pollard*, 780 F.3d at 399-400, 403

17    (suspect had a warrant for his arrest on charges which included assault with a deadly

18    weapon, and officers were told that he was potentially armed and had a concealed-carry

19    permit); *Simmonds*, 682 F.3d at 441-42 (suspect's father told officers that suspect owned

20    a pistol and shotgun and said he didn't know whether suspect was armed, and officers

21    heard suspect yell that he had a gun right before they fired); *Hill*, 2010 U.S. Dist. LEXIS

22    74655, at *2-4 (officers knew that suspect was wanted for questioning in connection

23    with an armed robbery that involved the use of a firearm, and another armed robbery that

24    involved a stabbing, and had prior arrests for weapons offenses and crimes of violence,

25    and had been told by an informant that the suspect was armed with a black pistol); *cf.*

26    *Hammett*, 875 F.3d at 1040 (officers were advised that there was "no intelligence as to

27    whether firearms were present at the house" that they were searching); *Slattery*, 939 F.3d

28    at 214-15 (location where shooting occurred had a history of drug activity and incidents

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

involving weapons and violence, including a drive-by shooting, and officers had recovered guns from individuals that they had arrested at the location). The officers in *Corrales*, *Barnes*, *Bowles*, *Nehad*, *Arian*, *Hammett*, *Pollard*, *Simmonds*, *Lamont*, *Slattery*, and *Hudspeth* were never given any information which indicated that the suspect they were confronting did not have any weapons.

The suspects in *Barnes*, *Bowles*, *Arian*, *Pollard*, *Lamont*, *Hudspeth*, and *Little* led officers on vehicle pursuits that involved high rates of speed and/or erratic or reckless driving, or ran away from officers who were attempting to arrest or detain them, or were involved in a physical altercation with officers. *See Barnes*, 508 F. App'x at 664-65 (suspect and officers were involved in a "physical struggle"); *Bowles*, 2012 U.S. Dist. LEXIS 71996, at *3-4 (suspect ran from officers when they attempted to detain him and continued to flee despite orders to stop and warnings that he would be tased); *Arian*, 2013 U.S. Dist. LEXIS 192420, at *2-3 (suspect led officers on a high-speed vehicle pursuit and drove erratically during the pursuit); *Pollard*, 780 F.3d at 399-400, 403 (suspect led officers on a vehicle pursuit that put his own life and the lives of others at risk and demonstrated his determination to avoid capture); *Lamont*, 637 F.3d at 179-180 (suspect fled from officers in a stolen vehicle, and then abandoned the vehicle and ran into the woods); *Hudspeth*, 2016 U.S. Dist. LEXIS 91053, at *2-5 (suspect led officers on a vehicle pursuit and drove erratically during the pursuit); *Little*, 114 F. Supp. 2d at 440 (officers and suspect were engaged in a violent physical altercation that resulted in head injuries to one of the officers).

Ten of the fourteen cases Defendants cite involved shootings that occurred at night or in locations where there was little, if any, illumination or ambient light. *See Bowles*, 2012 U.S. Dist. LEXIS 71996 at *2-4; *Nehad*, 2017 U.S. Dist. LEXIS 208537, at *3, *Elvira*, 2016 U.S. Dist. LEXIS 136215, at *3-6; *Arian*, 2013 U.S. Dist. LEXIS 192420, at *2; *Hammett*, 875 F.3d at 1040-41, 1049; *Simmonds*, 682 F.3d at 441; *Lamont*, 637 F.3d at 179-180; *Slattery*, 939 F.2d at 214; *Hudspeth*, 2016 U.S. Dist. LEXIS 91053 at *2; *Little*, 114 F. Supp. 2d at 440. Three of the other cases Defendants cite -- *Corrales*,

1  *Barnes*, and *Hill* - contain no information about the time of day that the shooting

2  occurred, or the lighting at the location of the shooting. The *Pollard* case is the only case

3  which involved a shooting that occurred during the daytime. *See* 780 F.3d at 399.

4       Many of the material facts and circumstances in this case are distinguishable from

5  the cases that Defendants rely on to support their contention that they are entitled to

6  summary judgment. When viewed in the light most favorable to Plaintiffs, the evidence

7  in this case establishes all of the following facts. The call that Officer Gonsalves was

8  responding to concerned a "5150" subject who had walked into traffic. Gonsalves had no

9  information which indicated that Mr. Olango had committed or attempted to commit a

10  crime, did not see Mr. Olango committing any crimes or engaging in any form of

11  criminal activity, and was not contacting Mr. Olango for the purpose of arresting Mr.

12  Olango or investigating his involvement in any criminal activity. Gonsalves never

13  received any information which indicated that Mr. Olango was armed or potentially

14  armed with a weapon, had threatened anyone with a weapon, owned a weapon or had

15  access to a weapon, had a permit for a weapon, was known to possess weapons, or had a

16  history of weapons offenses. Gonsalves had been advised that Mr. Olango did not have

17  any weapons. Lucy Olango told Gonsalves on two separate occasions that Mr. Olango

18  did not have any weapons. The call details on the computer in Gonsalves' patrol vehicle

19  also stated that Mr. Olango had no weapons. Mr. Olango never ran from Gonsalves at

20  any time, or became involved in any sort of physical struggle with Gonsalves or any

21  other person, and there was no vehicle pursuit in this case. The shooting of Mr. Olango

22  also occurred during the afternoon hours, during broad daylight. These facts distinguish

23  this case from the cases Defendants have cited.

24       Several of the cases that Defendants cite are distinguishable from this case in other

25  ways which are material to the issues before the Court, and have not yet been discussed.

26  In the *Corrales* case, the evidence showed that the officer stopped firing as soon as the

27  suspect fell to the ground. *See* 650 F. App'x at 541. The evidence in this case shows that

28  Gonsalves shot Mr. Olango in the arm, and then continued to fire his weapon at Mr.

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

Olango as Mr. Olango's body fell to the ground and rotated away from him. In the *Barnes* case, the plaintiffs failed to point to any evidence which suggested that the officers did not believe, or should not believed that the object in the suspect's hands was a gun, and the evidence they did rely on did not discredit the officers' testimony. *See* 508 F. App'x at 665. The Plaintiffs in this case have submitted testimony and other evidence which contradicts Gonsalves' testimony regarding the positioning of Mr. Olango's body during the time that he was firing. There is also evidence in this case which indicates that Gonsalves did not reasonably believe that the object he claims he saw in Mr. Olango's hands was a firearm. *See* Part II.A, *supra*, at pp. 20-21. A gun was also found at the scene of the shooting in the *Barnes* case. *See* 508 F. App'x at 665. No guns or other weapons were found at the scene of the shooting in this case.

In the *Bowles* case, the officer fired a single shot which struck the suspect's left chest area. *See* 2012 U.S. Dist. LEXIS 71996, at *4. Officer Gonsalves fired four shots at Mr. Olango. Three of those shots were fired as Mr. Olango's body fell to the ground and rotated away from Gonsalves. In the *Nehad* case, the location of the gunshot wound that the suspect sustained was consistent with the officer's testimony regarding his positioning at the time of the shooting. *See* 2017 U.S. Dist. LEXIS 208537, at *4-5 (officer testified that suspect was advancing towards him when he fired, gunshot wound was located on suspect's chest). The locations and trajectories of the gunshot wounds to Mr. Olango's chest, neck, and shoulder are inconsistent with Gonsalves' testimony regarding Mr. Olango's positioning during the time that he was firing. *Nehad* is also distinguishable because the officer in that case never received any information which indicated that the call he was responding to involved mental illness or emotional distress. *See id.* *13. In the *Elvira* case, the suspect was actually armed with a knife. *See* 2016 U.S. Dist. LEXIS 136215, at *6. Mr. Olango was not armed with a weapon at any time during the incident which culminated in his death. The plaintiffs in the *Elvira* case also failed to submit any evidence which disputed the officers' accounts of what transpired immediately prior to and during the time in which the suspect was being shot. *See id.* at

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

*20-22. The evidence in this case shows that the last three shots Gonsalves fired were fired as Mr. Olango's body fell to the ground and rotated away from Gonsalves. This evidence is inconsistent with Gonsalves' testimony regarding Mr. Olango's positioning during the time that he was firing his weapon.

**G.    The San Diego County Superior Court Has Determined That There are Genuine Issues of Fact Concerning the Reasonableness of Officer Gonsalves' Conduct**

The shooting of Mr. Olongo has given rise to several lawsuits, all of which have been brought by his surviving family members. They are as follows:

<u>State Court Actions</u>

1.    *Lucy Olango v. City of El Cajon, et al.*, San Diego Superior Court Case No. 37-2017-00005331-CU-PO-CTL, filed on February 10, 2017

2.    *Taina Rozier, et al. v. City of El Cajon, et al.*, San Diego Superior Court Case No. 37-2018-00036420-CU-PO-CTL, filed on July 16, 2018

<u>Federal Actions</u>

3.    *Richard Olongo Abuka, et a. v. City of El Cajon, et al.*, United States District Court Case No. 17-cv-89-BAS-NLS, filed on January 13, 2017

4.    *Taina Rozier, et al. v. City of El Cajon, et al.*, United States District Court Case No. 17-cv-347-BAS-NLS, filed on February 21, 2017

The state court action of *Lucy Olango v. City of El Cajon* asserts a single cause of action for negligent infliction of emotional distress. (Exhibit C to RJN, at p. 7:15-17.) In an Order dated May 18, 2018, this Court, at the request of Plaintiffs Taina Rozier, C.O., and H.C., dismissed Plaintiffs' claim for wrongful death based on negligence, which is now pending in the San Diego Superior Court.

<u>The Motion for Summary Judgment That the City of El Cajon and Officer Gonsalves</u>
<u>Filed in the State Court Action of *Lucy Olango v. City of El Cajon*</u>

On February 9, 2018, the City of El Cajon and Officer Richard Gonsalves filed a Motion for Summary Judgment in the state court action of *Lucy Olango v. City of El*

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

*Cajon*. (*See* Exhibit C to RJN.) The City and Gonsalves asserted in their motion that summary judgment was appropriate because Gonsalves' conduct was objectively reasonable as a matter of law under the totality of the circumstances. (*Id.* at pp. 18-23.) In analyzing the relevant standard of review, the City and Gonsalves asserted that "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances" and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (*Id.* at p. 18). In urging the Superior Court to grant summary judgment in their favor, the City and Gonsalves asserted that "[t]he video conclusively establishes that any objectively reasonable officer in Gonsalves' position would have believed his or her life was in danger," that Gonsalves "met his duty to use reasonable care in deciding to use and in fact using deadly force," and that Lucy Olango's negligent infliction of emotional distress claim "fails because the shooting was reasonable." (*Id.* at p. 22.)

<u>The San Diego Superior Court's Ruling on the Motion for Summary Judgment in the State Court Action of *Lucy Olango v. City of El Cajon*</u>

The San Diego Superior Court determined that genuine issues of fact existed on the issue of the reasonableness of Officer Gonsalves' shooting of Mr. Olango, and denied the City's and Gonsalves' motion for summary judgment, reasoning as follows:

"There are triable issues here. See for example the evidence cited regarding the tactical decisions prior to the confrontation with the victim *as well as evidence regarding the reasonableness of conduct during the confrontation.*"

(*See* Exhibit B to RJN, at p. 2) (emphasis added).

"Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992). "To foreclose relitigation of an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

1 necessary part of the judgment in the earlier action." *Id.* As set forth above, in the state

2 court action of *Lucy Olango v. City of El Cajon*, the San Diego County Superior Court

3 conclusively determined that genuine issues of fact existed regarding the reasonableness

4 of Officer Gonsalves' shooting of Mr. Olango which precluded summary judgment. A

5 similar result is compelled in this case under the doctrine of collateral estoppel.

6 **III.   OFFICER GONSALVES  IS NOT ENTITLED TO QUALIFIED**
   **IMMUNITY**

THE
COCHRAN
FIRM
CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

8 **A.    The Determination of Whether Officer Gonsalves is Entitled to**

9          **Qualified Immunity is Premature Because There Are Material Factual**

10         **Disputes Concerning the Reasonableness of His Repeated Use of Deadly**

11         **Force**

12         Qualified immunity should not be granted in this case because there are material

13 factual disputes concerning the objective reasonableness of Officer Gonsalves' use of

14 deadly force against Mr. Olango. In cases where there are disputed issues of material fact

15 regarding the reasonableness of an officer's conduct, qualified immunity should not be

16 granted. *See, e.g., Glenn*, 673 F.3d at 870 ("We express no opinion as to the second part

17 of the qualified immunity analysis and remand that issue to the district court for

18 resolution after the material factual disputes have been determined by a jury"); *Espinosa*

19 *v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming the

20 denial of qualified immunity because there were genuine issues of fact regarding whether

21 the officers violated the decedent's Fourth Amendment rights and "those unresolved

22 issues of fact were also material to a proper determination of the reasonableness of the

23 officers' belief in the legality of their actions"); *Wilkins v. City of Oakland*, 350 F.3d

24 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends

25 on the resolution of disputed issues of fact in their favor, and against the non-moving

26 party, summary judgment is not appropriate"); *Santos*, 287 F.3d at 855 n.12 (finding it

27 "premature" to decide whether the officers were entitled to qualified immunity "because

28 whether the officers may be said to have made a 'reasonable mistake' of fact or law may

17-cv-89-BAS-NLS

depend on the jury's resolution of disputed facts and the inferences it draws therefrom");

District courts in the Ninth Circuit have applied this rule and denied summary judgment on the issue of qualified immunity in cases where there are genuine issues of material fact. *See Bui*, 61 F. Supp. 3d at 891, 899 (holding that genuine issues of material fact prevented the court from deciding whether the officers were protected from qualified immunity); *McCloskey v. Courtnier*, 2012 U.S. Dist. LEXIS 25493, at *9-11 (N.D. Cal. Feb. 28, 2012) (denying qualified immunity because the facts which were relevant to the issue of qualified immunity were "inextricably intertwined with the disputed facts [that were] relevant to the issue of excessive force"); *Burns v. City of Redwood City*, 737 F. Supp. 2d 1047, 1062 (N.D. Cal. 2010) ("[The officers] insist that they made a reasonable mistake of fact as to the level of threat presented. Just as the question of whether a constitutional violation occurred here turns entirely on whose facts to accept, so too does the question of immunity"); *Herrera v. Las Vegas Metro. Police Dep't*, 298 F. Supp. 2d 1043, 1051 (D. Nev. 2004) (concluding that a reasonable jury could find that the officers violated the decedent's Fourth Amendment rights and holding that "it would be premature to determine the officials' qualified immunity status at this time, because whether the officers may be said to have acted reasonably will depend on the jury's resolution of the disputed facts.").

There are material factual disputes in this case concerning Mr. Olango's positioning at the time of the shooting. Officer Gonsalves claims that throughout the time in which he was firing, Mr. Olango had his arms extended out in front of his body in a "shooting stance," and was facing him and pointing an object that he believed was a firearm at his head. Gonsalves also claims that he stopped firing after he saw Mr. Olango start to the fall to the ground and drop the object he had, and that Mr. Olango did not start to fall to the ground until after he fired his fourth shot. These claims are contradicted by the locations and trajectories of the gunshot wounds that Mr. Olango sustained. There are also material factual disputes concerning the reasonableness of Gonsalves' belief that the object he claims he perceived in Mr. Olango's hands was a

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

firearm. These factual disputes are critical to the issue of Gonsalves' entitlement to qualified immunity. Until and unless those factual disputes are resolved in Gonsalves' favor, Gonsalves is not entitled to qualified immunity.

**B.     Officer Gonsalves Violated Mr. Olango's Clearly Established Fourth Amendment Rights When He Shot Mr. Olango**

An officer is not entitled to qualified immunity if the facts, when viewed in the light most favorable to the plaintiff, show: (1) that the officer's conduct violated a constitutional right; and (2) the right was clearly established under the preexisting law. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A right is 'clearly established' when its contours are sufficiently defined, such that 'a reasonable official would understand that what he is doing violates that right.'" *Foster v. Runnels*, 554 F.3d 807, 815 (2009). With regard to the level of similarity between the case at issue and the cases that make up the preexisting law, the Supreme Court has held that while a plaintiff is not required to point to a case that is "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). In accordance with this precedent, the Ninth Circuit has held that a plaintiff in a Fourth Amendment excessive force case must identify "a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." *S.B. v. County of San Diego*, 864 F.3d 1010, 1015-16 (9th Cir. 2017).

The first prong of the qualified immunity analysis is met in this case. As discussed in Part II.A-B, *supra*, when the evidence in this case is viewed in the light most favorable to Plaintiffs, it shows that Officer Gonsalves used excessive force against Mr. Olango in violation of his Fourth Amendment rights. The second prong of the qualified immunity analysis is also met in this case because it was clearly established on the date that Mr. Olango was shot that an officer who uses deadly force against a person who is armed with a weapon, but is facing away from the officer when he is shot or is in the process of turning away from the officer and/or falling to the ground when he is shot, has

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205

17-cv-89-BAS-NLS

committed a Fourth Amendment violation. *See Curnow*, 952 F.2d at 325; *Chien Van Bui*, 61 F. Supp. 3d at 894-97. When the facts in this case are viewed in the light most favorable to Plaintiffs, they show that Mr. Olango was wounded by Officer Gonsalves' first shot, was falling to the ground and rotating away from Officer Gonsalves while he was being shot, was not facing Gonsavles when Gonsalves fired the shots that struck the back of his left shoulder and the left side of his neck, and posed no immediate threat of death or serious bodily injury to Gonsalves or others. Since the law at the time of the shooting of Mr. Olango had clearly established that it was unlawful for Gonsalves to use deadly force under the circumstances confronting him, Gonsalves is not entitled to qualified immunity.

## IV. **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment as to Plaintiffs' Fourth Amendment excessive force claim.


DATED: October 22, 2018          Respectfully submitted,

THE COCHRAN FIRM CALIFORNIA


By: /s/ Brian T. Dunn
                    BRIAN T. DUNN
                    MEGAN R. GYONGYOS
                    Attorneys for Plaintiffs TAINA ROZIER,
                    C.O., and H.C.
                    Email: bdunn@cochranfirm.com
                    Email: mgyongyos@cochranfirm.com

THE COCHRAN FIRM CALIFORNIA
4929 Wilshire Bl.
Suite 1010
(323)435-8205