# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7   RICHARD OLANGO ABUKA,        )
    et al.,                      )
8                                )
                 Plaintiffs,     )
9                                )
         vs.                     )   Case No.: 17-cv-89-BAS-NLS
10                               )
    CITY OF EL CAJON, et al.,    )
11                               )
                 Defendants.     )
12   _____ )

13

14

15

16

17      VIDEOTAPED DEPOSITION OF RICHARD GONSALVES

18              EL CAJON, CALIFORNIA

19                 MAY 30, 2018

20

21

22

23

24   REPORTED BY MARTHA OJEDA-JIMENEZ, CSR NO. 13574

25

1      **A**    Yes.

2      **Q**    What specifically were you trained in that

3    regard?

4      **A**    That you have to be sure of your surroundings

5    and what's beyond the target that you're shooting at,

6    and that, essentially, you're responsible for the rounds

7    that you fire.

8      **Q**    Now, with regard to the justification for the

9    use of deadly force, would you agree with the statement

10    that you are authorized to use deadly force when you are

11    confronted with an eminent threat?  Would agree with

12    that as a premise, of death or serious bodily injury to

13    yourself or to another?

14         MR. DEAN:  Asked and answered.

15         MR. DUNN:  He has asked and answered.  I'll --

16    I'll move on.

17    BY MR. DUNN:

18      **Q**    Would you agree with the general premise that

19    after a -- a threat no longer exists, that you are no

20    longer authorized to use deadly force against the person

21    being shot?

22      **A**    Yes.

23      **Q**    Would you agree that with regard to a shooting

24    scenario, such as this, in which you fire more than one

25    round, that to be consistent with the POST guidelines,

1    as I described, each round you fire should be fired at a

2    time in which you are faced with an eminent threat of

3    death or serious bodily injury either to yourself or to

4    another person?

5              MR. DEAN:  Incomplete hypothetical.  Lacks

6    foundation.  It calls for him to speculate.

7    BY MR. DUNN:

8       Q    Do you understand what I was trying to ask?   I

9    can rephrase it in -- in a different way.

10      A    Can you try and rephrase it?

11      Q    Okay.  Let me try to rephrase it.

12           Okay.  Assume for this purpose of this

13    question -- and we'll talk about the shooting in detail

14    later.

15           You fired four times, correct?

16      A    Yes.

17      Q    Would you agree with the general statement that

18    when you fired each of those four rounds, that you were

19    faced, in your mind, with an eminent threat of death or

20    serious bodily injury?

21              MR. DEAN:  Vague and ambiguous with respect to

22    the question as phrased.

23              If you have an understanding, go ahead and

24    answer the question.

25              THE WITNESS:  Yes.

1    stopped.

2    **Q**    Are you trained to shoot after the threat has

3    stopped?

4    **A**    No.  Unless the threat were to reappear.

5    **Q**    Are you given any training with regard to any

6    specific number or numbers of shots that may be fired,

7    prior to any instruction to reassess whether the threat

8    still exists?

9    **A**    No.  Our training, as far as shooting in a

10    deadly force situation, is to shoot until the threat has

11    stopped.

12    **Q**    And it would be fair to say that there's no

13    specific number of shots that may be associated with

14    that?

15    **A**    Correct.

16    **Q**    It could be one shot or it could be as many as

17    10 shots?

18    **A**    Correct.

19    **Q**    Now, we were talking before the break about

20    some issues that I have called reaction time and lag

21    time.

22          Do you recall that discussion?

23    **A**    I don't remember the term lag time, but --

24    **Q**    I -- I think we said reaction time.

25    **A**    Reaction time.

1    BY MR. DUNN:

2        Q    Okay.  You do not believe that?

3             MR. DEAN:  He said, "I do not know that."

4    BY MR. DUNN:

5        Q    As you sit here today, do you have any

6    knowledge as to how long you were shooting at

7    Mr. Olango?

8        A    In regards to time?

9        Q    Yes.

10       A    No.

11       Q    Do you have any estimate?

12       A    Less than a second.

13       Q    And what is that based on?

14       A    My memory.

15       Q    Have you ever had occasion to review an

16    audiotape recording of the shots that you fired?

17       A    No.

18       Q    Okay.  So with regard to the use of deadly

19    force, you are POST certified, correct?

20       A    Yes, sir.

21       Q    And would you agree with the principles as

22    articulated -- that I have here, in Learning Domain 20,

23    it states, "The use of deadly force is the most serious

24    decision a peace officer may ever have to make.  Such a

25    decision should be guided by the reverence for human

1    life and used only when other means of control are

2    unreasonable or have been exhausted."

3              Would you agree with that principle?

4    **A**    Yes.

5    **Q**    And is that consistent with your training with

6    the El Cajon Police Department?

7    **A**    Yes.

8    **Q**    Now, did you ever receive any training with --

9    well, in any aspect of your career, were you ever

10   trained that a use of deadly force may be justified

11   after a threat has ceased under circumstances in which

12   you failed to perceive that the threat has ceased

13   because of your reaction time?

14             MR. DEAN:  Incomplete hypothetical.  It lacks

15   of foundation.

16             MR. DUNN:  It's a training question.

17   BY MR. DUNN:

18   **Q**    Just were you ever trained?

19             MR. DEAN:  I hear you.  Same objections.

20             THE WITNESS:  I didn't -- I don't understand.

21   BY MR. DUNN:

22   **Q**    Okay.  Well, you -- you indicated that you were

23   exposed to certain scientific principles that you have

24   dubbed to be consistent with reaction time.

25   **A**    Yes.

1    **Q**    Well, applying those principles to deadly force

2    training, did you ever receive any training in which you

3    were specifically instructed that under circumstances in

4    which a threat exists, but no longer exists, that you

5    can continue to use deadly force if you react late to

6    the nonexistence of the threat?

7            MR. DEAN:  Assumes facts.  Incomplete

8    hypothetical.

9    BY MR. DUNN:

10    **Q**    You still under the question or you do not?

11    **A**    Yes, I do.

12    **Q**    Okay.  Can you answer?

13            MR. DEAN:  Same objections.

14            THE WITNESS:  I can't say that I have ever been

15    trained like that, the way you described it.  The best

16    that I can answer that is, repeating what I said before,

17    that I've been taught to -- once I perceive a deadly

18    force situation to shoot until the threat is no longer

19    present.

20    BY MR. DUNN:

21    **Q**    Now, in this particular case, we heard some

22    testimony from Officer McDaniel earlier that referenced

23    a specific scenario at the moment of the shooting in

24    which Mr. Olango was holding an identity in his hands

25    and pointing it at you.

```
 1            Do you remember that occurring?

 2    A     Yes.

 3    Q     And would it be fair to say that that's why you

 4  shot?

 5    A     Yes.

 6    Q     Was Mr. Olango in that position throughout the

 7  time in which you fired all four shots?

 8    A     Yes.

 9    Q     Was Mr. Olango facing you with his arms pointed

10  in front you, holding the object in -- in his hand

11  towards you, when you fired all four shots?

12    A     Yes.

13    Q     And on what basis do you make that affirmative

14  determination?

15    A     My memory, and I believe that's what it depicts

16  in the video that I saw.

17    Q     Would it be fair to say that you did not intend

18  to shoot Mr. Olango in the back?

19    A     Yes.

20    Q     Would it be fair to say that you did not intend

21  to shoot Mr. Olango after -- strike that.

22            Would it be fair to say that you did not intend

23  to shoot Mr. Olango when he was in a position such that

24  he was not pointing anything in your face?

25            Do you understand the question?
```

1    until I felt that the threat was not a threat anymore.

2         However, if after firing the rounds, if I would

3    have been presented with another threat to my life, I

4    think I would have fired again.

5    **Q**    Now, do you believe that you may have

6    discharged the rounds by accident?

7    **A**    No.

8    **Q**    Any one of them?

9    **A**    No.

10   **Q**    Did you -- well, I'll rephrase it.

11        Now, I'd like to cover one more aspect of

12   training briefly, and that concerns field contacts with

13   persons with mental illnesses.

14        Did you ever receive any specific training on

15   that subject?

16   **A**    Yes.

17   **Q**    When did you receive such a training?

18   **A**    In the police academy and then throughout my

19   career.

20   **Q**    Were the principles of such training guidelines

21   consistent in the police academy, as compared to

22   throughout your career?

23   **A**    Yes.

24   **Q**    What are some of the principles that you recall

25   that you were trained with regard to field contacts with

1    persons with mental illnesses?

2    **A**    I've been trained on what the various types of

3    mental illness conditions are, some of the ways that

4    they manifest themselves in people's behavior, ways to

5    talk with them, offer safety concerns; how to -- or

6    advice on making determinations on whether a person, per

7    the Welfare and Institutions Code, is a danger to

8    themselves or others or is gravely disabled.

9    **Q**    That would be 5150?

10    **A**    Yes, sir.

11    **Q**    I cut you off.  Please continue.

12    **A**    The ways in which you can take a person into

13    custody for that, for 5150; how to do the application

14    for the psychological eval, where to take them, the

15    different facilities that are available, process for

16    having them seen by a doctor.

17    **Q**    Okay.  It appears as though you've perhaps

18    answered.

19            With regard to tactical actions that officers

20    should be aware of in field contacts with persons with

21    mental illnesses, what are some tactical actions that

22    are consistent with your training that would be

23    applicable under certain circumstances?

24            MR. DEAN:  Incomplete hypothetical.  Lacks

25    foundation.

1          Go ahead.

2          THE WITNESS:  Can you explain what you mean by

3    tactical option?

4          MR. DUNN:  Let me rephrase it.

5    BY MR. DUNN:

6      Q    Learning Domain 37 in POST, I'm going to

7    represent to you, discusses this exact subject.

8      A    Okay.

9      Q    "Field Contacts with Persons with Mental

10   Illnesses," it's probably about 120 pages.  I brought

11   two.

12         So I'm going to let you look at a couple of

13   them with your counsel --

14         MR. DEAN:  I --

15         MR. DUNN:  -- he's -- he's seeing them right

16   there.  You can just look at it.

17         MR. DEAN:  It's that page and the next page.

18         THE WITNESS:  Okay.

19         Okay?

20   BY MR. DUNN:

21     Q    All right.  Having had an opportunity review

22   those guidelines that are set forth in Learning Domain

23   37, pages 4-12, and 4-13, do they appear to be

24   consistent with your training with the El Cajon Police

25   Department?

1    **A**    In general theory, yes.  I just -- I don't

2    agree with the use of guidelines, because I don't think

3    that's what those are.

4    **Q**    Would you agree, generally, with the premise

5    that persons with mental illnesses may perceive things

6    that are, in fact, not there?

7    **A**    Yes.

8    **Q**    Would you agree, generally, that persons with

9    mental illnesses may perceive threats that do not exist?

10    **A**    Yes.

11    **Q**    Would you believe that persons with mental

12    illnesses, based on the functioning of their mind, may

13    not be able to hear everything that you would be telling

14    them as a police officer, with regard to commands, for

15    example?

16    **A**    I don't know that I've ever been taught that.

17    **Q**    Have you ever been taught that a person with a

18    mental illness may not be able to process a command in

19    the same way that a person without a mental illness

20    would be able to?

21    **A**    I don't remember being taught that, but that

22    seems like just general knowledge, yeah.

23    **Q**    Were you ever trained, specifically, that in

24    field contacts with persons with mental illnesses, it is

25    preferable not to make threats against that person if

1    would not be true or one specific situation that we can

2    look up in which that would not be the case.

3        A    Well, I think that incident with Mr. Olango,

4    that we're talking about today, I don't believe he had

5    committed a felony.

6        Q    Do you believe that he subjected you to a

7    deadly threat?

8        A    Yes.

9        Q    How so?

10       A    He pointed an object that I believed to be a

11   gun in a shooting stance and pointed it at what I

12   believed was my head.

13       Q    At some point did you learn that it was not a

14   gun?

15       A    Yes.

16       Q    How did that occur?

17       A    When I walked up to render first aid to him.

18       Q    And how, specifically, did you come to learn

19   that it was not a firearm?

20       A    I saw it lying next to him.

21       Q    And what did you see?

22       A    A device that I now know to be a -- a vape.

23       Q    At that time did you know that it was a vape?

24       A    No.

25       Q    At that time did you know what a vape was?

1              Are you aware of any information that in any

2    way led you to believe that the source of the 911 call

3    was Mr. Olango's sister?  Were you aware of that prior

4    to the shooting?

5         A     I believe so.

6         Q     How so?

7         A     I don't remember if it was in the initial radio

8    call or if she had mentioned that when she contacted

9    Officer McDaniel, in which I was present.

10        Q     Are you aware of the fact that the CAD printout

11   states at approximately 10 minutes before the shooting,

12   that there was a report that Mr. Olango had no weapons?

13        A     I do not remember that.

14        Q     Okay.  Have you ever received any information

15   that would lead you to believe -- or that -- strike

16   that.

17             Have you ever received any information that

18   confirmed, in your mind, that it was reported that

19   Mr. Olango had no weapons at or around 12:58 p.m. that

20   day?

21        A     No.

22        Q     Did you ever receive any information that

23   Mr. Olango is -- was mentally unstable?

24        A     Yes.

25        Q     And what information did you have in that

1    regard?

2    **A**    I think that it was from the radio call.  It

3    said something about -- it described the person's

4    behavior, that they were walking in traffic or running

5    in front of cars or something to that effect, and I

6    believe it said something about mental illness or -- I

7    don't --

8          They may have even, like, classified the call

9    as -- 5150 would be a generic term for a call that it's

10   believed that the person might have a mental illness or

11   a breakdown or something like that.

12   **Q**    Prior to your first encounter with

13   Mr. Olango -- Mr. Olango, in other words prior to the

14   time in which you first saw him, did you have any

15   information that he had injured any person?

16   **A**    No.

17   **Q**    Did you have any information that he was armed

18   with any kind of a weapon?

19   **A**    No.

20   **Q**    Did you have any information that he had

21   committed any crime?

22   **A**    Not specifically, no.

23   **Q**    Surely, you would agree that he had not

24   committed a felony or that you had no information that

25   he had committed a felony prior to your first encounter

1      with him?

2          **A**      That's true.

3          **Q**      And did you ever speak to miss -- to

4      Lucy Olango prior to arriving at the location where the

5      shooting ultimately occurred?

6          **A**      I did not personally speak with her, no.

7          **Q**      Did you ever have any discussions with

8      Officer McDaniel about any tactical plan that the two of

9      you would employ prior to your first contact with

10     Mr. Olango?

11         **A**      I think I might have told him that I was going

12     to go check in the direction that Lucy had indicated

13     last seeing him, but that -- I think that was it.

14         **Q**      Did you have any discussions as to who would be

15     the contact officer and who would be the cover officer?

16         **A**      No.  Because we hadn't found him yet.

17         **Q**      Did you have any discussion as to whether or

18     not any less than lethal impact devices would be used

19     should one or both of you encounter Mr. Olango?

20         **A**      No.  We hadn't even contacted him yet.

21         **Q**      Well, let's fast forward it to up until the

22     time of the shooting.

23              During that entire day, did you have any

24     discussions with Officer McDaniel as to the deployment

25     of any less than lethal weapons?

1    A    Anytime during that day?

2    Q    Yes.

3    A    No.

4    Q    Now, I'm referencing a report that came in at

5    2:10:41, and it states, and I quote, 833 Broadway on one

6    with pocket, refusing to remove hand.

7         Do you have any familiarity with that familiar

8    entry?

9    A    It's sounds like it was probably one of my

10   broadcasts, but I don't have an independent recollection

11   of those specific words.

12   Q    Do you recall making a broadcast approximately

13   one minute before the shooting?

14   A    I can't comment in regards to the time.  I know

15   I made a number of broadcasts between the time that I

16   first saw Mr. Olango and the time that the shooting

17   happened.

18   Q    Okay.  With regard to those broadcasts, did any

19   of them report that Mr. Olango was armed?

20   A    Not specifically, no.

21   Q    Why did you report -- assuming you did.  I'm

22   going to just tell you for the purposes of this

23   question, please assume that there's a Call for Service

24   Detail Report that references a call that comes in

25   approximately one minute before the shooting, and it

1      Q    Were you ever given a specific training as to

2   how to encounter a subject that you believed may be

3   armed with a weapon, such as a firearm?

4           Let me rephrase it.

5           Were you ever given any specific training as to

6   how you would encounter a suspect whom you believe may

7   have a concealed weapon that is a firearm in his pocket?

8           MR. DEAN:  Incomplete hypothetical.  Lacks

9   foundation.  Calls for him to speculate as to the

10  meaning of the question.

11          MR. DUNN:  It's a training question --

12          MR. DEAN:  (Speaking simultaneously.)

13          MR. DUNN:  It's what -- what were you trained.

14          MR. DEAN:  Yeah.  The objection still stands,

15  because -- well, it stands.

16          You can answer the question.

17          THE WITNESS:  I have received training in

18  addressing individuals that are armed with firearms and

19  other weapons.

20  BY MR. DUNN:

21      Q    And what specific tactical considerations are

22  you trained to employ when encountering such

23  individuals?

24          MR. DEAN:  Same objections.

25          THE WITNESS:  Cover, concealment, distance.

1    any information that he had tried to enter any of the

2    businesses; is that true?

3        **A**    Correct.

4        **Q**    So generally speaking, when do you think you

5    first drew your gun?

6        **A**    After telling him at least a couple of times to

7    take his hand out of his pocket and motioning with my

8    hand, at least a couple of times, to take his hand out

9    of his pocket.  I think it was around that time.

10       **Q**    And why did you draw your firearm at this

11   point?

12       **A**    I was concerned for my safety.

13       **Q**    And I mean, to specify, you were concerned for

14   your safety because you were concerned that he might

15   have something in his pockets that could hurt you -- or

16   pocket that could hurt you; is that correct?

17       **A**    Yes.

18       **Q**    Where -- where was your partner at this point

19   in which you first became concerned for your safety?

20       **A**    If you're referring to Officer McDaniel.

21       **Q**    I am.  I apologize.

22            Where was Officer McDaniel at this point when

23   you first became concerned for your safety?

24       **A**    I don't know.

25       **Q**    When you made the call, which was summarized

```
 1    2:11:53.

 2            Do you believe that it would be fair to say

 3    that it was between one minute and -- and one and a half

 4    minutes that passed from the time in which you first saw

 5    him on foot and the time in which you fired?

 6       A    I think that's roughly accurate.

 7       Q    How far away were you from Mr. Olango when you

 8    first saw him?

 9       A    40, 50 feet.

10       Q    And what was he doing when you first saw him?

11       A    Walking.

12       Q    Had you seen him commit a crime?

13       A    No.

14       Q    Did you have any information that he had

15    committed any crime?

16            MR. DEAN:  Asked and answered.

17    BY MR. DUNN:

18       Q    At this point when you're 40 or 50 feet away

19    from him.

20       A    Potentially.

21       Q    What crime?

22       A    If he had, in fact, been jumping in front of

23    cars and walk into traffic.

24       Q    Where -- where did you hear that he was jumping

25    in front of cars?
```

1    doing those things.

2              What crime would that be?

3        A    I can't tell you the specific section of the

4    Vehicle Code, but there are sections for people that do

5    not properly use crosswalks, cross streets in areas that

6    they're prohibited from doing that.

7        Q    Would those be considered crimes against the

8    person?

9        A    No.

10       Q    Would they be considered felonies?

11       A    No.

12       Q    Would they even be considered misdemeanors?

13       A    Some of them may.  There are some Vehicle Code

14   violations that are misdemeanors.

15       Q    Okay.  But you didn't have any specific

16   information that he had committed any crime; is that

17   correct?

18       A    Nobody told me that he specifically committed a

19   crime.

20       Q    You were not contacting him for the purpose of

21   arresting him for committing a crime, correct?

22       A    Correct.

23       Q    Now, you were contacting him because a

24   reporting party had said that he was acting erratically

25   and mentally unstable, correct?

1      **A**    Yes.

2      **Q**    Did -- did it appear to you that he heard you

3   when you told him, for example, to take your hand out of

4   your pocket?

5      **A**    If he was capable of hearing, if he was not

6   deaf, then yes, I believe that he could hear me.

7      **Q**    Why?  I apologize.  Why?

8      **A**    Because of the distance we were apart and the

9   volume of my voice.

10     **Q**    Did he knowledge your presence in any way?

11          MR. DEAN:  Vague as to time.

12          Are we beyond the approach now?

13  BY MR. DUNN:

14     **Q**    Let's clarify about the -- the commands.

15          Did he ever say anything to you in response to

16  your commands?

17     **A**    One time.  Yes.

18     **Q**    What did he say?

19     **A**    "No."

20     **Q**    Did he look at you?

21     **A**    Yes.

22     **Q**    Did he in any way come at you in an attacking

23  manner?  In other words, did he move towards you when

24  you were telling him "let me see your hand"?

25     **A**    He did not walk towards me, no.

1      Q     Are you familiar with the term that is commonly

2   used that is referenced with the words "close the

3   distance"?

4      A     Yes.

5      Q     Do you believe that it would be fair to say

6   that you closed the distance on Mr. Olango after you

7   were 40 to 50 feet from him as you described?

8              MR. DEAN:   Vague and ambiguous as to time.

9   Lacks foundation.

10  BY MR. DUNN:

11     Q     You can answer.

12     A     So we -- we might need clarification for this

13  to make sense, because the time that I first saw him, I

14  was still in my police vehicle and on one property, and

15  I saw him cross another property, so there was no

16  advancement or closing the distance on either part at

17  that point.

18             I moved my car around in the direction that he

19  was walking.  That's when I got out of my car and first

20  tried to contact him, and from that point on, I don't

21  believe that I closed the distance with him or he didn't

22  close the distance with me.  He was walking backwards,

23  and I was trying to follow him and just maintain the

24  distance that had already been established when I had

25  gotten out of my car.

1    the location.  This is very awkward.

2            THE WITNESS:  Not in that exact spot, but he

3    had been near that spot to the east in the -- in the --

4    BY MR. DUNN:

5        Q    All right.  Let me rephrase it.

6            Are you familiar with where he was when he was

7    shot?

8        A    Yes.

9        Q    Where is that?

10       A    The southeastern corner of Los Panchos Taco

11   Shop on Broadway.

12       Q    How long had he been in that location, from

13   what you recall, prior to the shooting?

14       A    Ten seconds.  I -- I don't know.

15       Q    Did you have eyes on Mr. Olango for that ten

16   seconds?

17       A    No.

18       Q    What were you focused on, if anything?

19       A    Well, I was focused on him, but I had looked

20   over my shoulder to see who was behind me.

21       Q    And what did you see in that regard?

22       A    I saw a lady who I now know was Lucy Olango.

23       Q    Now, do you believe that Mr. Olango posed a

24   threat of violence to Lucy Olango in the 10-second

25   period prior to the time in which you fired?

1      **A**      Okay.

2      **Q**      So after you had your gun drawn, at that point,

3      do you have an estimate as to how much time passed

4      between the time in which you first drew your weapon and

5      the time in which the first shot was fired?

6              MR. DEAN:  Object as vague and ambiguous,

7      because your words are draw a weapon and your gesture

8      was pointing his weapon.

9      BY MR. DUNN:

10     **Q**      Go ahead.  Go ahead.  You can answer that.

11             MR. DEAN:  Well, do you mean drawn or pointed?

12     BY MR. DUNN:

13     **Q**      Go ahead.  You can answer that question.

14             MR. DEAN:  Objection.  Vague and ambiguous with

15     respect --

16     BY MR. DUNN:

17     **Q**      You can answer the question.

18             MR. DEAN:  -- to the term draw, especially when

19     you point.

20             Go ahead.

21             THE WITNESS:  If -- if you mean took my weapon

22     out of my holster --

23     BY MR. DUNN:

24     **Q**      Yes.

25     **A**      I don't know for sure.  I don't have an

1    **A**    Yes, sir.

2    **Q**    What is the time?

3    **A**    If I had to estimate, I would say 50 seconds to

4    a minute.

5    **Q**    Now, during that 50 seconds to a minute, would

6    you agree with the concept that Mr. Olango was moving

7    away from you?

8    **A**    Yes.

9    **Q**    Would you further agree with the concept that

10    after Mr. Olango moved away from you, you moved towards

11    him?

12    **A**    Yes.

13    **Q**    And why did you do that?

14    **A**    Because I tried to maintain contact with him.

15    I tried to keep him somewhat contained in an area until

16    other officers arrived.

17    **Q**    Did you believe that you would not be able to

18    keep him contained at a distance of 20 feet or less?

19    MR. DEAN:  Vague and ambiguous.

20    THE WITNESS:  I don't understand what you mean.

21    BY MR. DUNN:

22    **Q**    All right.  Now, with regard to the concept of

23    containment as an objective -- let's see.

24    Have you overheard of anything called the

25    21-foot rule?

1    Mr. Olango.  I was merely following where he was going.

2        Q    And would you agree with the statement that

3    during this period of time after you first drew your

4    firearm, that it was in your possession, specifically,

5    it was in your hands, from that period of time up until

6    the time in which you fired the first shot?

7        A    Yes.

8        Q    And with regard to your actions, did you

9    consider that Mr. Olango may have been suffering from a

10   mental illness in your tactical approach during that

11   period of time, and specifically, from the time in which

12   you drew your weapon up until the time in which the

13   first shot was fired?

14       A    I believe that that was one possibility, yes.

15       Q    And why did you believe that?

16       A    That was based on some of the information that

17   I received in the radio call.  Some of his behavior that

18   I witnessed could be a result of person with some kind

19   of mental illness diagnosed mental illness or maybe a

20   some kind of mental breakdown.

21       Q    With regard to the manner in which you were

22   holding your firearm, was it the same throughout the

23   time in which you drew it, up until the time of the

24   first shot?

25       A    No.

1    **Q**    How did it change?

2    **A**    It changed, essentially, three times.  When I

3    first got out of my car and tried to contact Mr. Olango,

4    my weapon was in my holster.  At some point towards the

5    beginning of the encounter, I took it out of my holster

6    and held it down along my leg.

7         Later on, during the encounter, I had brought

8    it up into what's considered a compressed low ready

9    position.  And then, ultimately, when I believed that

10    Mr. Olango was going to shoot me, I was in a standard

11    two-handed shooting stance.

12    **Q**    Do you believe that your gun was visible to

13    Mr. Olango when it was being held down in the first

14    position that you described by your leg?

15    **A**    I don't know.  I was trying not to make it

16    obvious.

17    **Q**    Do you believe that your firearm may have been

18    visible to Mr. Olango when it was in the compressed low

19    ready position that you described?

20    **A**    Yes.

21    **Q**    Did any aspect of Mr. Olango's demeanor lead

22    you to the conclusion that he was afraid?

23         MR. DEAN:  Vague as to time.

24    BY MR. DUNN:

25    **Q**    You can answer.

1    left him, but at the time frame that we are talking

2    about, I don't know what he was doing.

3        Q    Did you ever have any knowledge as to his

4    whereabouts during that period of time after you first

5    drew your -- your firearm and before the first shot was

6    fired?

7        A    Yes, sir.

8        Q    And when did you first acknowledge Officer

9    McDaniel in that time period?

10       A    Seconds before Mr. Olango pulled the item of

11   his pocket.

12       Q    When you first saw Officer McDaniel, was he

13   still in his car or was he on foot at this point?

14       A    I think when I first saw him, himself, not the

15   police car, he was on foot.

16       Q    Did you have any discussion at any time with

17   Officer McDaniel, at any time that day, as to how you

18   would contain Mr. Olango if he tried to flee?

19       A    I never had a chance to.

20       Q    Please explain why you never had a chance to.

21       A    Do you want me to stay within the time frame

22   we're talking about?

23       Q    No.  At any time.  Explain how -- explain your

24   answer, please.

25       A    We both arrived and met up in the same parking

1    lot for this call.  Lucy Olango came across the street

2    and contacted Officer McDaniel -- excuse me.

3          Officer -- I was still in my car.

4    Officer McDaniel had gotten out of his car to speak with

5    Lucy.  I saw Lucy kind of turn over her shoulder and

6    make a motion with her hand in a southwesterly direction

7    from where we were, and I heard her say something to the

8    effect of "he's over there" or "I last saw him over

9    there," something like that.

10          I drove from where I was over into the strip

11    mall area off of Broadway.  I may have told Josh, "Hey,

12    I'm going to go look" or I just drove away fairly

13    confident that he understood that's what I was doing.

14          So we were never -- we were no longer together

15    to have the conversation.  I hadn't found Mr. Olango

16    yet, so there was no point in having any conversation.

17          When I did see Mr. Olango and moved to contact

18    him, the situation evolved rapidly from that point on,

19    and I put out all the information that I could on the

20    radio while still trying to deal with Mr. Olango and get

21    him to take his hand out of his pocket.

22          The next time I saw Officer McDaniel wasn't

23    until seconds before the shooting, and we -- there

24    was -- there was -- Officer McDaniel showed up.

25    Mr. Olango produced what I thought was a gun and pointed

1    general area, knowing that other officers were on the

2    way, and those -- those resources were coming.

3        Q    Now, I may have asked you this, and if I did, I

4    apologize, but did it appear to you that he was trying

5    to get into any of the businesses that were in the area?

6            MR. DEAN:  Asked and answered.

7            MR. DUNN:  I did.

8    BY MR. DUNN:

9        Q    Did I ask --

10       A    Yes, sir.

11       Q    Okay.  Would the answer be "no"?

12       A    Correct.

13       Q    Did he appear to you that he was trying to

14   assault or threaten any civilians that were in the area?

15       A    No, sir.

16       Q    Did you ever see him running?

17       A    No.

18       Q    Did you ever see him moving at a pace that was

19   so fast that you believed that you would not be able it

20   continue to see him if you yourself were walking in that

21   period of time, from the moment in which you drew your

22   weapon up until the time of the shooting?

23       A    No.  As far as -- you're just asking about his

24   speed, correct?

25       Q    Yes.

1      **A**    No.  He wasn't moving any faster than a

2    backwards walk.

3      **Q**    So during that period of time, would it be fair

4    to say that from what you saw him doing with regard to

5    his actions, that had he continued moving at the pace

6    that you saw him moving, you would have been able to

7    keep eyes on him from a distance of 40 feet?

8            MR. DEAN:  Lacks foundation.  Incomplete

9    hypothetical.

10            THE WITNESS:  I'm not sure of the distance,

11    based on where I was and where -- the direction in which

12    he was moving, how far it would have taken him to get

13    around the corner of one of the many buildings that were

14    in the area.  But I felt that if -- if I just stayed

15    where I was, if I stayed at my patrol car and he

16    continued to walk away, at some point if -- if he

17    continued to walk away, at some point he would have been

18    out of my view.

19    BY MR. DUNN:

20      **Q**    How close would you say you were to Mr. Olango

21    when he draw the object from his hand as you described?

22            MR. DEAN:  From his pocket?

23            MR. DUNN:  Yes.

24            THE WITNESS:  I think.

25

1  BY MR. DUNN:

2      Q    I apologize.

3           Yes.  When he drew the object from his pocket

4  and held it in his hand, as you described.

5      A    Yes, sir.  I believe around 15 feet.

6      Q    Why were you that close to him at that moment?

7      A    He had moved into an area that he kind of

8  self-contained -- contained himself, if that makes

9  sense.  He backed into an area between the chain link

10 fence and a parked vehicle and kind of went into that

11 corner.

12          So when he stopped walking, I stopped and -- I

13 think, it could have been 20 feet.  I'm not sure.  I'm

14 estimating I think it was about 15 feet.  And I stayed

15 there because my -- my whole thought, up until that

16 point until other officers arrived, was just to keep him

17 contained so that when we got other resources there, we

18 could try and formulate a plan and see if there was some

19 way that we could help him.

20     Q    Was it your belief that you had to be as close

21 as 15 feet away from him for him to remain contained in

22 the area that you described?

23     A    That's where I found myself when he stopped

24 walking.

25     Q    Now, with regard to the actions of his sister,

1    did you ever hear her vocalizing anything prior to the

2    shooting?

3        A    So yes, but I think I need to clarify.  Sorry.

4             I heard somebody behind me, that I believed was

5    a female, yelling while I was focused on Mr. Olango and

6    addressing him.

7        Q    What was that person saying?

8        A    I don't know.  I didn't know who it was.  I

9    wasn't focused on what they were saying.  I was focused

10   on Mr. Olango and what he was doing.

11            There was a moment right before the shooting,

12   once Officer McDaniel had showed up.  I felt that at

13   least I had somebody to watch or keep an eye on

14   Mr. Olango so I could find out who it was behind me,

15   because that was starting to make me uncomfortable,

16   because it felt like they were getting closer.  And I

17   looked over my shoulder.  That's the first time that I

18   realized that it was Lucy.

19       Q    Let me stop you.

20            What was it about the fact that that -- the

21   owner of that voice was getting closer that caused you

22   to feel uncomfortable?

23       A    Similar to what I talked about earlier with

24   having to account for somebody's hand, because of the

25   potential threat, you learn not to let somebody come up

1  behind you unless you're able to do some kind of a

2  threat assessment.

3      Q     Was there something about her vocalizations

4  that caused to you feel uncomfortable?

5      A.    Just -- it was loud.

6      Q     Do you ever recall saying anything to that

7  woman in the, say, 20-second period prior to the

8  shooting?

9      A     Yes.

10     Q     And what did you say?

11     A     I told her to stay back or get back.

12     Q     Do you recall using the words "shut the fuck

13 up"?

14     A     No.  I didn't.

15     Q     You didn't say that?

16     A     No, sir.

17     Q     Did you ever hear anyone say that?

18     A     No, sir.

19     Q     Are you familiar with any audio recordings that

20 depict the incident in the 20-second period preceding

21 the shooting in which the words can be heard, "Shut the

22 fuck up"?

23     A     No.  I believe there's audio on one of the

24 videos, but I -- the time that I watched it, I don't

25 remember hearing those words.  I can tell you that I

1    didn't say it.

2        Q    So tell me a little bit about the weapon you

3    had.

4             What was the make and model?

5        A    It was a Glock 22 semiautomatic pistol.

6        Q    .40 caliber?

7        A    .40 caliber, yes, sir.

8        Q    And what's the cartridge capacity of that

9    weapon?

10       A    Fifteen rounds in the magazine.  It can hold a

11   total of 16 with one in the chamber.

12       Q    Was it fully loaded, as far as you knew, that

13   day?

14       A    Yes, sir.

15       Q    What else did you have, if anything, in the way

16   of -- of other weaponry?  Did you have a Taser on your

17   person?

18       A    No, sir.

19       Q    Did you have OC spray on your person?

20       A    Yes, sir.

21       Q    Did you have a baton of any kind?

22       A    Not on me.

23       Q    Where was it?

24       A    In my vehicle.

25       Q    What type of baton was it?

1    **A**    I don't know the make and model of it.  It was

2  just a straight police baton.

3    **Q**    Were you -- strike that.

4         Did you have access to any nonlethal projectile

5  weapon systems such as a bean bag shotgun or a 40

6  millimeter?

7         MR. DEAN:  On his person?

8  BY MR. DUNN:

9    **Q**    I'm asking do you have access to it.

10    **A**    I believe there was a bean bag shotgun in my

11  vehicle.

12    **Q**    Okay.  Now, why did you stop firing after the

13  fourth round?

14    **A**    I saw Mr. Olango start to fall to the ground

15  and drop the item that was in his hand.

16    **Q**    Did you see that at any time prior to the time

17  in which you fired your fourth round?

18    **A**    No.

19    **Q**    We were discussing some issues related to fire

20  discipline earlier.

21         Why did you not fire only one round?

22    **A**    I have been trained throughout my career to

23  fire at the target until the threat no longer is there.

24    **Q**    What was it about Mr. Olango that caused him to

25  be a threat after you fired the first shot?

1      A      He was holding what I believed was a gun in a

2    standard shooting position with it pointed directly at

3    me.

4      Q      And what was it that caused him to be a threat

5    after you fired the second shot?

6      A      So you realize that this happens in fractions

7    of a second, right?

8      Q      We'll talk about that in a moment.

9            But, first of all, what was it that caused him

10   to pose a threat after the second shot?

11     A      I can't answer that.  I saw a threat, and I

12   addressed it until I saw that threat go away.

13     Q      What was the nature of the threat that you saw

14   after you fired the second shot?

15          MR. DEAN:  Assumes facts that this witness can

16   differentiate that.  Lacks foundation.  Calls for

17   speculation.  Might call for an expert opinion.

18          If you can answer, go ahead.

19          THE WITNESS:  I -- I can't answer it any better

20   than I have.  I'm sorry.

21   BY MR. DUNN:

22     Q      Well, I must ask.

23          What was it about the threat that you perceived

24   after the third shot that caused you to fire a fourth

25   shot?

1          MR. DEAN:  Same objections.

2          THE WITNESS:  I saw Mr. Olango produce what I

3    thought was a handgun, take up a shooting stance, point

4    the weapon -- what I believed was a weapon -- at me.  I

5    believed I was about to shoot.  At that point I started

6    firing my weapon.

7          I can't tell you what he did specifically in

8    the one one-thousandth of a second between the first

9    round being fired and the second round being fired.

10          I can tell you that after my fourth round, I

11    saw Mr. Olango start to fall to the ground and drop what

12    was in his right hand, and that's why I stopped

13    shooting.

14    BY MR. DUNN:

15    **Q**    Now, a few moments ago that you made a comment

16    to me to the effect of "you realize this all happened in

17    fractions of a second."

18          Do you recall that?

19    **A**    Yes, sir.

20    **Q**    And what -- why would you tell me that?

21    **A**    I -- I feel like you're asking me to be able --

22    like -- like I -- I'm breaking down a video for you

23    that's broken down into individual frames.  That's --

24    that's not the way that I remember it.  I don't know

25    that a human being can perceive things that quickly.  So

1    Q    Did you see what she was wearing?

2    A    In general terms, yes.

3    Q    Did you formulate the conclusion or the opinion

4    that she was Alfred Olango's sister?

5    A    I -- I think I assumed that.  I -- I have a

6    memory of that -- the fact that the reporting party was

7    the sister or related.  I believe that was in part of

8    the original radio call that I received.  And so when

9    she came over and started talking to Officer McDaniel, I

10   think that's what I assumed at the time.

11   Q    Did you in any way acknowledge her presence at

12   the scene in the period of time that we've commonly

13   referred to as the 50 seconds to a minute after you drew

14   the weapon and prior to the shooting?  Did you in any

15   way during that time period know that she was there?

16   A    Yes.

17   Q    And when do you think that was, first?

18   A    Seconds before the shooting.

19   Q    So just to elaborate on that a bit, prior to

20   that seconds before the shooting -- and can you give me

21   how many seconds it was?

22   A    Probably less than two.  It -- my memory says

23   that it was almost instantaneous, but two to five

24   seconds, maybe.

25   Q    If I were to represent to you that she were

1   I, MARTHA OJEDA-JIMENEZ, CSR No. 13574, Certified

2   Shorthand Reporter for the State of California, do

3   hereby certify:

4

5   That the witness in the foregoing deposition was by me

6   first duly sworn to testify to the truth, the whole

7   truth and nothing but the truth in the foregoing cause;

8   that the deposition was taken by me in machine shorthand

9   and later transcribed into typewriting, under my

10  direction, and that the foregoing contains a true record

11  of the testimony of the witness.

12

13  Dated:  This 30th day of May, 2018, at San Diego,

14  California.

15

16

17

18

19  _____

20  Martha Ojeda-Jimenez, CSR No. 13574

21

22

23

24

25